[No. A103129. First Dist., Div. Four. Apr. 30, 2004.]

LINDA PETTYE et al., Plaintiffs and Respondents, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Appellants.

234

236

## COUNSEL

Dennis J. Herrera, City Attorney, Burk E. Delventhal, Wayne Snodgrass and Ellen Forman, Deputy City Attorneys, for Defendants and Appellants.

Lawyers' Committee for Civil Rights, Oren Sellstrom; Bay Area Legal Aid, Stephen Bingham and Michael Keys for Plaintiff and Respondent Linda Pettye.

Lynn S. Carman for Plaintiff and Respondent Nora Roman.

## OPINION

**SEPULVEDA, J.**—On November 5, 2002, the San Francisco voters passed Proposition N, the "Care Not Cash" initiative which, among other things, amended the city's[1] general assistance (G.A.) standards of aid and care for homeless indigents. Proposition N requires that the City replace the bulk of outright cash grants to homeless recipients with in-kind benefits for housing, utilities and meals, to the extent such services are available.

Two San Francisco residents—a G.A. recipient and a taxpayer—challenged these provisions. However the challengers did not attack the substance of the "Care Not Cash" initiative. Rather, they successfully asserted that under Welfare and Institutions Code section 17001,[2] only the board of supervisors—not the voters—could enact the amendments. Adhering to our duty to jealously guard the prerogative of initiative, we liberally construe that power, concluding that section 17001 does not express a "clear" or "definite" intent to restrict that right and therefore the presumption favoring its exercise has not been overcome. (See *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775–776 [38 Cal.Rptr.2d 699, 889 P.2d 1019] (*DeVita*).) Accordingly, we reverse the judgment.

## I. FACTUAL BACKGROUND

### A. *Statutory Scheme*

■ California law imposes on cities and counties a mandatory duty to "relieve and support all incompetent, poor, indigent persons, and those

---

[1] Appellants are the City and County of San Francisco (City or San Francisco), the City's Department of Human Services, and Trent Rhorer, its director.

[2] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code. Section 17001 provides: "The board of supervisors of each county, or the agency authorized by county charter, shall adopt standards of aid and care for the indigent and dependent poor of the county or city and county."

incapacitated by age, disease, or accident," who are not supported or relieved by other means. (§ 17000.) Section 17000 provides for a residual fund to sustain indigents who do not qualify for other forms of specialized aid. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 991 [90 Cal.Rptr.2d 236, 987 P.2d 705].) Commonly referred to as "general assistance" relief, this is a program of " 'last resort.' " (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 92 [61 Cal.Rptr.2d 134, 931 P.2d 312].) Counties act as agents of the state in administering G.A. relief and are governed by the general law in this role. (*Mooney v. Pickett* (1971) 4 Cal.3d 669, 679 [94 Cal.Rptr. 279, 483 P.2d 1231]; *San Francisco v. Collins* (1932) 216 Cal. 187, 191–192 [13 P.2d 912].)

California law further requires that standards of aid and care for the indigent and dependent poor be adopted by each county's board of supervisors, or the agency authorized by county charter. (§ 17001.)

■ So long as a county establishes a G.A. "standard of aid, including the value of in-kind aid . . . , that is 62 percent of a guideline that is equal to the 1991 federal official poverty line" with certain adjustments (§ 17000.5, subd. (a)), it generally can structure the program to suit local needs. This is because section 17001 confers upon counties "a broad discretion 'to determine eligibility for, the type and amount of, and conditions to be attached to indigent relief.' [Citations.]" (*Mooney v. Pickett, supra*, 4 Cal.3d at pp. 678–679; see *Hunt v. Superior Court, supra*, 21 Cal.4th at p. 991.) And while counties must exercise this discretion in harmony with state law, and in furtherance of its objectives,[3] they "retain[] extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid." (*Mooney v. Pickett, supra*, 4 Cal.3d at p. 680.)

B. *San Francisco's G.A. Program*

San Francisco has established and operates a G.A. program in compliance with section 17000. (S.F. Admin. Code,[4] §§ 20.55, 20.55.1(a).) The purpose of the G.A. program "is to provide short-term financial or in-kind assistance and other services to indigent residents of the City and County who are

---

[3] Section 10000 spells out these objectives. They are "to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." Further, such aid and services are to be administered "promptly and humanely," with due regard for preservation of family life, and in a nondiscriminatory manner. (*Ibid.*)

[4] References to the San Francisco Administrative Code are to the code as it existed prior to adoption of Proposition N. References to the Revised San Francisco Administrative Code are to the code as amended by Proposition N.

unable to support themselves and have exhausted their own means of support . . . ." (*Id.*, § 20.55.4(b).)

Prior to adoption of Proposition N, the board of supervisors had enacted G.A. eligibility standards that afforded a qualified eligible indigent resident a maximum cash subsistence grant of $320 per month.[5] (S.F. Admin. Code, § 20.57(a), (d).) With the adoption of Proposition N on November 5, 2002, the voters declared a new purpose: "The goal of the Care Not Cash Initiative is to provide all homeless San Franciscans without dependents, who qualify for aid through the County Assistance Programs, food, shelter/housing and health services replacing the majority of existing cash grants with these guaranteed services. This change will allow the City of San Francisco to increase mental health treatment services, expand alcohol and substance abuse programs and create more affordable housing. The initiative will bring San Francisco in line with almost every other major California County, thereby eliminating the incentive for homeless individuals who want cash rather than services to congregate here. The Care Not Cash Initiative will help reduce deaths from drug overdoses by eliminating most cash payments to homeless individuals and replacing them with guaranteed services." (Text of Prop. N, Statement of Purpose.)

The Care Not Cash initiative did not change the maximum monthly amount of aid to which qualified G.A. recipients are entitled. (Rev. S.F. Admin. Code, § 20.57(a).) Rather, in keeping with the new goal, the City was directed to (1) provide all "[s]elf-declared homeless applicants and recipients" with "in-kind benefits for housing, utilities, and meals" instead of cash, to the extent such services are available (*id.*, § 20.59.3(b)); and (2) correspondingly reduce cash grants to homeless G.A. recipients by the value of in-kind services provided (*id.*, § 20.57.6A). Additionally, the Care Not Cash initiative guaranteed a $59 special cash allowance per month, regardless of the value of in-kind assistance provided. (*Id.*, § 20.57.6A.)

## C. *Litigation*

Three weeks after the passage of the Care Not Cash initiative, respondents Linda Pettye and Nora Roman petitioned for writ of mandate to overturn sections one through seven thereof. Their sole challenge was to the power of the people to enact amendatory standards of care and aid for homeless G.A. recipients. The trial court granted the writ and directed the City to continue enforcing the G.A. standards previously established by the board of supervisors, reasoning that section 17001 delegates exclusive authority to the board of supervisors to set such standards. This appeal followed.

---

[5] In 1998 the G.A. cash grant for a single individual was $279. With cost of living increases, the amount had risen to $320 by the time the lawsuit was filed.

## II. DISCUSSION

### A. *The Local Initiative Power in General*

■ The local initiative is guaranteed by article II, section 11, subdivision (a) of the California Constitution[6] and generally is coextensive with the local governing body's legislative power. (*DeVita, supra*, 9 Cal.4th at p. 775.) In charter cities the initiative power may be even broader than the constitutional reservation. (*Rossi v. Brown* (1995) 9 Cal.4th 688, 696 [38 Cal.Rptr.2d 363, 889 P.2d 557].) "[A]s between the provisions of the Constitution and the provisions of a city charter, those which reserve the greater or more extensive [initiative or] referendum power in the people will govern." (*Hunt v. Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623 [191 P.2d 426].)

■ The reserved initiative power of the San Francisco electorate is extremely broad. (*Rossi v. Brown, supra*, 9 Cal.4th at p. 697.) The city charter vests in the voters the power to enact "any ordinance, act or other measure which is within the powers conferred upon the Board of Supervisors to enact . . . ." (S.F. Charter, art. XVII [defining "initiative"] and art. XIV, § 14.100 [providing that "voters of the City and County shall have the power to enact initiatives"].)

■ We liberally construe constitutional and charter provisions in favor of the people's right to exercise their reserved power of initiative. Indeed, it is our duty to " 'jealously guard' " this power so as not to improperly annul its exercise. (*DeVita, supra*, 9 Cal.4th at pp. 775–776; *Rossi v. Brown, supra*, 9 Cal.4th at p. 695.)

### B. *Judicial Limitations; Qualifications*

#### 1. *Historical Distinction Between Administrative and Legislative Acts*

In California, legislative and executive powers frequently coexist in the local governing body. (*Hopping v. Council of City of Richmond* (1915) 170 Cal. 605, 610 [150 P. 977].) Historically, courts have restricted the exercise of local initiative powers by drawing a distinction between legislative and administrative acts. *Hopping* was the first case to confine the local initiative process to the legislative orbit. There the issue was whether the city council's decision to accept an offer of land which would become the site for city hall was legislative and subject to referendum. The court first addressed the

---

[6] This provision reads in part: "Initiative and referendum powers may be exercised by the electors of each city and county under procedures that the Legislature shall provide." (Cal. Const., art. II, § 11, subd. (a).) Subject to exceptions not pertinent here, this constitutional provision "does not affect a city having a charter." (*Ibid.*)

relevant 1911 amendment to the Constitution, which preserved initiative and referendum powers for the electors of municipalities. It construed the amendment as applying only to acts of the governing body which amounted to an exercise of the legislative power. Similarly, the court explained that the city charter provisions reposing referendum powers in the Richmond citizenry "should be held applicable to all ordinances and resolutions which constitute an *exercise of legislative power*. The public discussion which led to the adoption of the referendum shows that it was directed at supposed evils of legislation alone. . . . In the absence of a very clear declaration to the contrary, it must be presumed that the power of referendum was intended to apply solely to the legislative powers of the city." (*Id.* at p. 611, italics added.)

Subsequently, courts have acknowledged that the people through their charter have the right to vest in themselves the "power to deal through initiative action with any matter within the realm of local affairs or municipal business, whether strictly legislative or not, as that term is generally used . . . ." (*Spencer v. City of Alhambra* (1941) 44 Cal.App.2d 75, 78 [111 P.2d 910]; see also *Rossi v. Brown, supra,* 9 Cal.4th at p. 696.)

Early on, a reviewing court articulated the classic test for distinguishing administrative from legislative action: "Acts constituting a declaration of public purpose, and making provision for ways and means of its accomplishment, may be generally classified as calling for the exercise of legislative power. Acts which are to be deemed as acts of administration, and classed among those governmental powers properly assigned to the executive department, are those which are necessary to be done to carry out legislative policies and purposes already declared by the legislative body, or such as are devolved upon it by the organic law of its existence." (*McKevitt v. City of Sacramento* (1921) 55 Cal.App. 117, 124 [203 P. 132].)

### 2. *Administrative Characterization Given to Delegated Powers in Statewide Affairs*

Courts have resorted to a second test for differentiating between administrative and legislative acts when the local initiative or referendum speaks to a subject also addressed by state law or policy. This distinction was first articulated as follows: "If the subject is one of statewide concern in which the Legislature has delegated decision-making power, not to the local electors, but to the local council or board as the state's designated agent for local implementation of state policy, the action receives an 'administrative' characterization, hence is outside the scope of the initiative and referendum." (*Hughes v. City of Lincoln* (1965) 232 Cal.App.2d 741, 745 [43 Cal.Rptr. 306]; see also *Memorial Hospitals Assn. v. Randol* (1995) 38 Cal.App.4th

1300, 1313 [45 Cal.Rptr.2d 547] (*Randol*).) More recently, our Supreme Court explained: "Acts of a local governing body which, in a purely local context, would otherwise be legislative . . . may, however, become administrative 'in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state' [citations]." (*Yost v. Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152].)

### 3. *Refinements to Analysis When Delegated Powers Are at Issue*

More recently still, the Supreme Court has labeled the administrative characterization of delegated powers "confusing" and "an unnecessary fiction." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 511 [247 Cal.Rptr. 362, 754 P.2d 708] (*COST*).) The court stated: "In matters of statewide concern, the state may if it chooses preempt the entire field to the exclusion of all local control. If the state chooses instead to grant some measure of local control and autonomy, it has authority to impose procedural restrictions on the exercise of the power granted, including the authority to bar the exercise of the initiative and referendum. [Citations.] [¶] . . . [¶] . . . The state's plenary power over matters of statewide concern is sufficient authorization for legislation barring local exercise of initiative and referendum as to matters which have been specifically and exclusively delegated to a local legislative body." (*Id.* at pp. 511–512.)

The statute at issue in *COST* gave discretionary authority to county boards of supervisors and city councils to impose development fees to finance highway construction. A citizen's group proposed an initiative that would prohibit the city council from imposing a new fee without first submitting the fee to a vote of the electorate. The question as framed by the Supreme Court was whether the Legislature intended to delegate authority exclusively to the local governing body, thereby precluding action by the electorate on the same subject. *COST* emphasized the statutory language, subject matter and history. First, a generic statutory reference to "governing body" or "legislative body" gives rise to a weaker inference of such intent than does a specific reference to boards of supervisors and city councils. Second, statutes that treat matters of statewide concern as opposed to strictly municipal affairs more readily support an inference of the intent to exclude ballot measures. Finally, other indications of legislative intent should also be considered. (*COST, supra,* 45 Cal.3d at pp. 501, 505–507.)

However, as the state's high court subsequently explained, *COST* itself should not be interpreted as prescribing "a set of fixed rules for mechanically construing legislative intent. Nor did *COST* alter the constitutionally based presumption that the local electorate could legislate by initiative on any

subject on which the local governing body could also legislate. Thus it is still the case that ' " '[i]f doubts can [be] reasonably resolved in favor of the use of [the] reserved initiative power, courts will preserve it.' " ' [Citations.]" (*DeVita, supra,* 9 Cal.4th at p. 777.) Moreover, courts should not "automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present. . . . [I]t is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decisionmaking implies a legislative intent to bar the right of initiative. Rather, courts must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body." (*Id.* at pp. 780–781.)

Recently in *Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714 [79 Cal.Rptr.2d 262] (*Empire*), this court built on the *COST* and *DeVita* rulings. Examining section 40059 of the Public Resources Code, which empowers "the governing body of the local government agency" to grant an exclusive franchise for solid waste handling services, and contains further reference to the "governing body" (*ibid.*), we concluded that the terms, taken in context, were "generically nonspecific" and thus supported only a weak inference that the Legislature intended to abrogate the right of local referendum (*Empire, supra,* at pp. 720–721). Further we observed that whether the subject was a matter of statewide or merely local concern might depend on how the issue is cut. If the question is whether everyone in California has a stake in the issue of solid waste management, the statewide interest is clear. But if the question is who collects the town's garbage and for how long, it becomes difficult to ignore the local flavor of the affair. (*Id.* at p. 722.)

## C. *Analysis*

The City insists that the trial court was wrong in its conclusion that the Legislature intended to annul the voter's power to enact G.A. standards of aid and care such as those set forth in Proposition N. Respondents counter that because counties act as arms of the state in administering G.A. aid, the adoption of standards of care is beyond the reach of the local initiative. They further argue that section 17001 exclusively delegates authority to adopt such standards to the board of supervisors, thereby annulling action by initiative. From our discussion on the evolution of case precedent concerning limits on the local initiative power, we are satisfied that the *COST-DeVita* line of cases announces the proper test for ascertaining whether that power was available to San Francisco voters when they enacted Proposition N. However, first we

dispel respondents' insistence that irrespective of the issues of delegation and statewide versus local concerns, the enactment of G.A. standards is an administrative act beyond the reach of the voters.[7]

### 1. *The Enactment of Standards for G.A. is a Legislative Act*

■ Standards of aid and care are in the nature of administrative regulations (*Tailfeather v. Board of Supervisors* (1996) 48 Cal.App.4th 1223, 1237 [56 Cal.Rptr.2d 255]), which establish new rules for application to future cases (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 275 [32 Cal.Rptr.2d 807, 878 P.2d 566]). As a general matter legislative action entails " 'formulation of a rule to be applied to all future cases.' " (*Ibid.*; see also *City and County of San Francisco v. Superior Court* (1976) 57 Cal.App.3d 44, 50 [128 Cal.Rptr. 712] [holding that lower court "would be encroaching on legislative territory should it undertake" to determine G.A. standards of aid and care after mandating that appropriate agency determine facts necessary to establish them].)

■ That courts—in cases not involving the availability of local initiative powers—have characterized counties as "agents"[8] of the state in providing G.A. benefits, does not change this result. After all, administrative agencies " 'may have executive, administrative, investigative, *legislative* or adjudicative powers.' " (*Traub v. Board of Retirement* (1983) 34 Cal.3d 793, 799, fn. 3 [195 Cal.Rptr. 681, 670 P.2d 335], italics added.) Moreover, by declaring a new goal and public policy with respect to care and aid for the indigent homeless (see text of Prop. N, Statement of Purpose, pt. I.B., *ante*), Proposition N manifests its quintessential legislative character. (See *Southwest Diversified, Inc. v. City of Brisbane* (1991) 229 Cal.App.3d 1548, 1555 [280 Cal.Rptr. 869], quoting 5 McQuillin on Municipal Corporations (3d ed. 1989) § 16.55, p. 266: " 'The power to be exercised is legislative in its nature if it prescribes a new policy or plan . . . .' ")

### 2. *The Trial Court Erred in Ruling that the Legislature Exclusively Delegated Authority to Set G.A. Standards to the Board of Supervisors.*

#### a. *Statutory Language; History*

*DeVita* and *COST*, read together, articulate a fluid test for discovering the Legislature's intention on the matter of exclusive delegation. The interpretive

---

[7] The power reserved in a city or county charter for the electorate can, as is the case here, extend beyond purely legislative acts. However, home rule cannot trump the general law on the question of exclusive delegation of a matter of statewide concern, addressed below.

[8] See, for example, *Mooney v. Pickett, supra*, 4 Cal.3d at page 679.

rules set out in *COST* are not "fixed" rules meant to be "mechanically" applied in divination of such intent. (*DeVita, supra*, 9 Cal.4th at p. 777.) Moreover, the intent to exclusively delegate must be clearly shown. (*Id.* at p. 780.)

The first step is to look at the words of the statute: Section 17001 directs that standards of aid and care for G.A. recipients shall be adopted by "[t]he board of supervisors of each county, or the agency authorized by county charter . . . ." This language is inconclusive on the matter of delegation. While a reference to a specific entity such as the board of supervisors gives rise to a stronger inference than a generic reference to governing or legislative body, here we have a specific reference coupled with a more general reference to whatever entity might be designated in a county charter to perform such task. The inference with respect to the latter is that the Legislature trusted whatever vehicle or entity a home rule county designated. While the section 17001 language suggests some inference of intent to cut off action by initiative, that inference is not overwhelming or dispositive.[9] (See *COST, supra*, 45 Cal.3d at p. 501.)

### b. *The State's Interest*

Next, we examine the nature of the concern and the state's precise regulatory interest. Unquestionably the provision of G.A. relief is a matter of statewide concern. (§§ 10600, 17000.) There is the overarching "macro" policy, which declares provision of public social services to be a statewide concern (§ 10600) and mandates each county to provide G.A. benefits to its indigent population (§ 17000). But through section 17001, the Legislature has also conferred broad discretion upon local governments to promulgate local, "micro" policies in furtherance of this statewide mandate. Within the overall state guidelines, counties retain extensive authority to set G.A. standards on matters ranging from eligibility to type and amount of relief and conditions attached thereto. (*Mooney v. Pickett, supra*, 4 Cal.3d at p. 678; see *Hunt v. Superior Court, supra*, 21 Cal.4th at p. 991.)

Courts will infer an exclusive delegation to local governing bodies in cases where resort to the initiative and referendum would frustrate the state's regulatory purpose. For example, the court in *COST* construed the relevant statute as reposing exclusive authority on the local governments in Orange County to raise highway construction funds in furtherance of the

---

[9] Respondents suggest that prior unenacted versions of the predecessor to section 17001, giving authority to the board of supervisors alone, or the board of supervisors or county welfare department, support their position on the question of legislative intent. To the contrary, if anything this slip of legislative history indicates that the Legislature rejected language which provided less flexibility to counties than the enacted provision.

statutory purpose of promoting a *regional* transportation system. (*COST, supra,* 45 Cal.3d at pp. 506, 509.) But as the *DeVita* court cautioned, we should not automatically assume that a statutory scheme that declares certain state interests but defers to local decisionmaking in other respects implies an intent to preempt the power of local voters to act through the initiative. (*DeVita, supra,* 9 Cal.4th at p. 781, discussing *Yost v. Thomas, supra,* 36 Cal.3d 561 [upholding referendum on land use plan amendment under Coastal Act: act sets minimum standards and policies with which local governments must comply but leaves wide discretion to determine and implement plan];[10] *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 280 [17 Cal.Rptr.2d 845] [although California Integrated Waste Management Act of 1989 sets forth statewide recycling goals, it does not preclude resort to initiative to adopt recycling plan required by act].) *DeVita* itself held that Napa voters could amend the land use element of their general plan by initiative.

 Respondents urge that we not rely on these cases because they involve matters *traditionally* subject to local control. But obviously in each instance the state had invaded these supposedly local provinces with specific legislation outlining statewide goals and concerns. The point is that the state/local dichotomy is one of degree. Our inquiry is whether a statutory scheme that contemplates spheres of local decisionmaking under a statewide scheme also reflects an intention that only the representatives of the people, but not the people themselves, can make those decisions.

The analytic approach we pursued in *Empire* on this point is helpful. Whether the subject is viewed as statewide or local depends on how one frames the inquiry. (*Empire, supra,* 67 Cal.App.4th at p. 722.) Here, if the question is whether the welfare of the indigent poor is a statewide concern, the answer is yes. But if the question is whether, because of the magnitude and uniqueness of the single homeless adults congregating in San Francisco, the City emphasizes a G.A. program that provides "care" instead of "cash" grants, the issue looks very local.

 Seen in that light, the local initiative power is not incompatible with the state's interest in ensuring provision of adequate G.A. benefits; rather, it is readily harmonized with that interest. So long as the standards of aid and care meet the statutory safe harbor level of assistance and further overall state objectives, section 17001 provides ample leeway for local variation in G.A. programs, leaving substantial autonomy in the hands of counties to craft G.A. programs to meet community needs. Indeed, with respect to charter munici-palities, even the basic decision as to who sets the standards remains in local

---

[10] The court in *DeVita* characterized the Coastal Act as establishing "a regime of state regulation *more intrusive* than the planning law . . . ." (*DeVita, supra,* at p. 781, italics added.)

hands. We therefore conclude it matters not to the Legislature whether G.A. standards are adopted by the board of supervisors or the voters.

### c. *Respondents' Authorities on This Point Are Not Persuasive*

Respondents first point to Attorney General opinions in the related context of health care for the indigent poor which concluded that the voters could not (1) resort to the local initiative to require the board of supervisors to contract with a hospital district to provide medical care for the indigent (7 Ops.Cal.Atty.Gen. 85, 87 (1946)); or (2) enact an ordinance requiring voter approval to close, lease, change management of or reduce services at a county hospital (80 Ops.Cal.Atty.Gen. 315, 318 (1997)). In both cases the Attorney General stated that the initiative power would constitute an improper interference with the administrative and executive powers of the board of supervisors. (7 Ops.Cal.Atty.Gen., *supra*, at p. 87; 80 Ops.Cal.Atty.Gen., *supra*, at p. 318 [quoting and reaffirming same].) Suffice it to say that Proposition N is legislative in nature and thus there is no issue of interference with an administrative function. Further, section 17001 is not analogous to the statutory schemes at issue in those opinions because the intent to vest exclusive authority with the board of supervisors is absent.

Respondents also counter that the exclusive delegation of authority to promulgate G.A. standards to a "continuous local body" "makes perfect sense." They note that indigent support is a "highly complex" issue with "significant" budgetary implications. The concern with lodging this power with the electorate rings hollow, particularly in light of the actual course of events with respect to the Care Not Cash initiative. Approximately nine months prior to the adoption of Proposition N, the board of supervisors considered adopting standards which were substantially the same as the Care Not Cash initiative, but declined to do so. After the trial court struck down Proposition N, the board of supervisors adopted G.A. standards that are substantially similar to the invalidated provisions of Proposition N.[11] In reality it appears that a minority of supervisors originally had the same notion as the electorate, and after the electorate spoke, a majority thought many of the rejected ideas were good. Further, as a general matter, as membership on a board of supervisors changes over time, so, too the policy perspectives of majorities and minorities can shift with the changing membership.

Nonetheless, citing *Randol, supra,* 38 Cal.App.4th 1300,, respondents in essence contend the voters lack the necessary knowledge and experience to undertake the setting of G.A. standards. The *Randol* court found "a clear

---

[11] The two differ in one key respect: The board of supervisors has determined that a homeless person's G.A. grant may not be reduced by the value of emergency shelter, as mandated by Proposition N.

legislative intent to isolate the [decision to adopt an exclusive operating area for air ambulance services] from the political will of the electorate" (*Randol, supra,* 38 Cal.App.4th at p. 1313), instead entrusting that decision to health care professionals (*id.* at pp. 1313–1314). On the other hand, section 17001 does not isolate the promulgation of G.A. standards from the political process. Rather, it allows the board of supervisors and other locally designated agencies to do the job, thereby anticipating that such standards will be tested by the political process. Moreover, the setting of broad standards for eligibility, type, amount and conditions of G.A. benefits is not an overly technical process. We take judicial notice that the issues have been broadly aired within the community, through the media and in public discourse. The contention that the voters are not as fit for the task of adopting rational and compassionate legislation addressing the aid and care of indigent homeless as their politically elected supervisors lacks support.

The judgment is reversed.

Kay, P. J., and Reardon, J., concurred.

Petitions for a rehearing were denied May 25, 2004, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied July 21, 2004. George, C. J., did not participate therein.