[No. B182733. Second Dist., Div. Six. May 18, 2006.]

GREGORY TOTTEN, as District Attorney, etc., et al., Plaintiffs and Respondents, v.
BOARD OF SUPERVISORS OF THE COUNTY OF VENTURA, Defendant and Appellant.

## Counsel

Noel Klebaum, County Counsel, Matthew A. Smith, Assistant County Counsel; Howard, Rice, Nemerovski, Canady, Falk & Rabkin and Steven L. Mayer for Defendant and Appellant.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

William H. Hair and Meghan B. Clark for Plaintiffs and Respondents Gregory Totten and Bob Brooks.

Amy Albano, City Attorney, and Tim W. Giles, Assistant City Attorney, for Plaintiff and Respondent City of Thousand Oaks.

Trutanich & Michel, C. D. Michel and Glenn S. McRoberts for Plaintiff and Respondent Citizens for a Safe Ventura County.

David R. LaBahn; George W. Kennedy, District Attorney (Santa Clara) and William W. Larsen, Special Assistant District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Jones & Mayer, Martin J. Mayer and Michael R. Capizzi for California State Sheriffs' Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Bell, McAndrews & Hiltachk and Thomas W. Hiltachk for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**YEGAN, J.**—Here we conclude that the electorate cannot, by initiative, in a general law county, enact an ordinance prescribing minimum future annual budgets for county public safety agencies. Such an ordinance exceeds the electorate's initiative power and is constitutionally invalid.

The Board of Supervisors of the County of Ventura appeals from a stipulated judgment entered in favor of respondent officials of Ventura County public safety agencies: Gregory Totten, District Attorney of the County of Ventura, and Bob Brooks, Sheriff of the County of Ventura. Additional respondents are the City of Thousand Oaks and Citizens for a Safe Ventura County.[1] Appellant contests the portion of the judgment upholding the validity of sections 4 and 5 of initiative Ordinance No. 4088 (hereafter the Ordinance). These two sections establish a minimum annual budget for Ventura County's public safety agencies. The sections usurp the board of supervisors' exclusive statutory power to adopt a budget by depriving it of the discretion to provide a lower level of funding.

Although the instant appeal involves the expenditure of money, it concerns an issue far greater than a monetary turf war between public entities. As we shall explain, sections 4 and 5 of the Ordinance not only chill the board of supervisors' exclusive power to enact a budget, but may well end up freezing it out of existence. We observe that this dispute is an unfortunate one. The board of supervisors and the public safety agencies have a history of serving and protecting all of the people of Ventura County. They should be on the same side. Nevertheless, they have a legitimate difference of opinion with respect to the effect of the Ordinance. We do not shrink from our duty to decide this dispute.

### Factual and Procedural Background

The Ordinance states that its purpose "is to ensure compliance with the constitutional mandate [of Proposition 172] and that priority be given to the provision of adequate public safety services." Proposition 172, adopted by the voters in November 1993, added section 35 to article XIII of the California Constitution. The section imposes a statewide sales and use tax at the rate of .5 percent. All revenues from the tax are to be transferred to the Local Public Safety Fund for allocation by the Legislature to counties. "Moneys in

---

[1] In addition to the briefing by the parties on appeal, we have permitted an amicus curiae brief to be filed in support of appellant by the California State Association of Counties. We have permitted amici curiae briefs to be filed in support of respondents by the California District Attorneys Association, the California State Sheriffs' Association, and the Howard Jarvis Taxpayers Association.

the Local Public Safety Fund shall be allocated for use exclusively for public safety services of local agencies." (*Id.*, § 35, subd. (d)(2).)

According to the Legislative Analyst's analysis of Proposition 172, the additional sales tax revenue generated by the measure was "intended to offset part of the $2.3 billion in county and city revenue losses that resulted from adoption of the state's 1993–94 budget. Specifically, $2.3 billion in annual property tax revenues were shifted from counties and cities to the schools, thereby reducing the state's funding obligations to public schools." (Ballot Pamp., Special Elec. (Nov. 2, 1993) p. 25.)[2]

To implement Proposition 172, the Legislature enacted Government Code sections 30051 through 30056.[3] The statutes create the Local Public Safety Fund in the State Treasury to receive the sales and use tax revenue generated by Proposition 172. (§ 30051.) The revenue in the fund shall be allocated to "each qualified county in proportion to its share of the total taxable sales in all qualified counties during the most recent calendar year for which sales have been reported by the State Board of Equalization." (§ 30052, subd. (a).) Each county must establish a Public Safety Augmentation Fund in its treasury to receive its share of the Proposition 172 revenues. (§ 30055.) "Amounts deposited in this fund shall be expended exclusively to fund public safety services, and for that purpose shall be allocated among the county and the cities in the county" pursuant to a statutory formula. (*Ibid.*) " 'Public safety services' includes, but is not limited to, sheriffs, police, fire protection, county district attorneys, county corrections, and ocean lifeguards. 'Public safety services' does not include courts." (§ 30052, subd. (b)(1).)

In 1994 Citizens for a Safe Ventura County collected sufficient signatures to qualify a public safety initiative measure (the Ordinance) for the ballot. Pursuant to Elections Code section 9116, in May 1995 appellant adopted the measure without submitting it to a vote of the electorate.[4]

---

[2] The California Ballot Pamphlet is available at the following Web site: <http://library.uchastings.edu/ballot_pdf/1993s.pdf> (as of May 18, 2006).

[3] All statutory references are to the Government Code unless otherwise stated.

[4] Elections Code section 9116 provides: "If the initiative petition is signed by voters not less in number than 20 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election preceding the publication of the notice of intention to circulate an initiative petition, and contains a request that the ordinance be submitted immediately to a vote of the people at a special election, the board of supervisors shall do one of the following: [¶] (a) Adopt the ordinance without alteration either at the regular meeting at which the certification of the petition is presented, or within 10 days after it is presented. [¶] (b) Immediately call a special election pursuant to subdivision (a) of Section 1405, at which the ordinance, without alteration, shall be submitted to a vote of the voters of the county. [¶] (c) Order a report pursuant to Section 9111 at the regular meeting at which the certification of

The Ordinance creates a Public Safety Augmentation Trust Fund to receive Proposition 172 revenues allocated to Ventura County. (Ordinance, § 1.) The Ordinance specifies the amounts of the budgets for the 1995–1996 fiscal year for the following Ventura County public safety agencies: "District Attorney, Sheriff, Corrections, Public Defender, and Ventura County Fire Protection District only." (*Id.*, §§ 3 & 7.) "These amounts shall be known as the 'Base Year Budgets' of the respective agencies." (*Id.*, § 3.) Section 4 of the Ordinance provides: "For subsequent years the budget for each Public Safety Agency shall, at a minimum, be one hundred percent of the Base Year Budget plus any associated inflationary costs." The Ordinance does not define "associated inflationary costs." Section 5 of the Ordinance provides: "That portion of a Public Safety Agency's Base Year Budget funded by General Fund Appropriations, plus any associated inflationary costs, shall continue to be funded by General Fund appropriations. That portion of a Public Safety Agency's Base Year Budget funded by [Proposition 172 revenues], plus any associated inflationary costs and any additional appropriations, allocations and equipment approved by the Board of Supervisors subsequent to the base year, shall first be funded from proceeds contained in the Public Safety Augmentation Trust Fund."

According to respondents, from 1996 until the 2001/2002 fiscal year, appellant interpreted the "any associated inflationary costs" provision as requiring "annual increases in the appropriations to each of the Public Safety Agencies in the amount of the actual increase in costs of delivering services, particularly increases in personnel costs, for that particular public safety agency."

In March 2001 appellant decided that, to calculate inflationary costs, it would use the Consumer Price Index for all items for the Los Angeles-Riverside-Orange County area as published by the Bureau of Labor Statistics of the United States Department of Labor (hereafter CPI). The change in calculation was recommended by Harry L. Hufford, the Interim Chief Administrative Officer. In a March 2001 letter to appellant, Hufford warned: "Public safety departments are increasingly consuming more net county cost and experiencing continual General Fund budgetary growth. Public Safety's net cost increased over a six-year period from 48% of total net county cost to 58%. On the other hand, non-public safety net cost decreased from 52% to 42%. [¶] Without a revision to the ordinance inflation factor definition, it is expected that the identified net cost disparity would continue to widen in the future." Hufford estimated that, by using the CPI to calculate inflationary costs, public safety budgets for the 2001–2002 fiscal year would be reduced by approximately $4.2 million.

the petition is presented. When the report is presented to the board of supervisors, it shall either adopt the ordinance within 10 days or order an election pursuant to subdivision (b)."

Respondents filed actions in superior court seeking, inter alia, a writ of mandate to compel appellant to abide by its pre-2001 interpretation of the "any associated inflationary costs" provision. The actions were consolidated.

Appellant moved for summary adjudication on the issue of the constitutionality of sections 4 and 5 of the Ordinance. Appellant contended, inter alia, that sections 4 and 5 are unconstitutional because they impair its exclusive authority over the county budget. The trial court disagreed and denied the motion for summary adjudication.

Thereafter, the parties signed a document entitled, "Settlement Agreement and Stipulation for Entry of Judgment" (hereafter Agreement) stating that its purpose "is to facilitate the Board's right to appeal the Superior Court's Ruling . . . that Sections 4 and 5 of the Ordinance are constitutional, while simultaneously resolving all remaining issues in the Consolidated Actions."

Pursuant to the Agreement, judgment was entered on April 19, 2005. Section 1 of the judgment declares that sections 4 and 5 of the Ordinance "are facially constitutional." Section 2 of the judgment governs the implementation of sections 4 and 5 of the Ordinance for the 2005/2006 fiscal year and thereafter. The judgment provides that section 2 will be inoperative if section 1 of the judgment is reversed on appeal. Appellant filed a notice of appeal from section 1 of the judgment.[5]

### Electorate's Right to Initiative May Be Restricted by the Legislature

■ "[T]he local electorate's right to initiative and referendum is guaranteed by the California Constitution, article II, section 11, and is generally co-extensive with the legislative power of the local governing body. [Citation.] . . . '[W]e will presume, absent a clear showing of the Legislature's intent to the contrary, that legislative decisions of a city council or board of supervisors . . . are subject to initiative and referendum.' " (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 [38 Cal.Rptr.2d 699, 889 P.2d 1019], fn. omitted (hereafter *DeVita*).) " '[T]he adoption of a budget is a legislative function . . . .' [Citation.]" (*Anderson v. Superior Court* (1998) 68 Cal.App.4th 1240, 1250 [80 Cal.Rptr.2d 891].)

■ The presumption in favor of the right of initiative is rebuttable upon a clear showing that the Legislature intended "to delegate the exercise of . . .

---

[5] We reject the contention of amicus curiae Howard Jarvis Taxpayers Association that the judgment should be affirmed because appellant lacks standing to challenge the constitutionality of the Ordinance. (See *City of Burbank v. Burbank-Glendale-Pasadena Airport Authority* (2003) 113 Cal.App.4th 465, 482–483 [6 Cal.Rptr.3d 367].)

authority exclusively to the governing body, thereby precluding initiative and referendum. [Citation.]" (*DeVita, supra,* 9 Cal.4th at p. 776.) If the Legislature so intended, the enactment of an ordinance by initiative would be constitutionally barred: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.)

█ In ascertaining whether the Legislature intended to delegate authority exclusively to the local governing body, the "paramount factors" are "(1) statutory language, with reference to 'legislative body' or 'governing body' deserving of a weak inference that the Legislature intended to restrict the initiative and referendum power, and reference to 'city council' and/or 'board of supervisors' deserving of a stronger one [citation]; (2) the question whether the subject at issue was a matter of 'statewide concern' or a 'municipal affair,' with the former indicating a greater probability of intent to bar initiative and referendum [citation]." (*DeVita, supra,* 9 Cal.4th at p. 776.) " ' " '[I]f doubts can [be] reasonably resolved in favor of the use of [the] reserve initiative power, courts will preserve it.' " ' [Citation.]" (*Id.,* at p. 777.)

### Statutory Language Expressly Delegates Authority over the County Budget to the Board of Supervisors

█ Ventura County is a general law county. In general law counties, "the structure of county government is laid out in various statutes enacted by the Legislature and found in the state Government Code." (*People ex rel. Kerr v. County of Orange* (2003) 106 Cal.App.4th 914, 917 [131 Cal.Rptr.2d 274].) Sections 29000 to 29093 set forth the procedures for the adoption of a budget by a general law county. These sections do not refer to a "legislative body" or "governing body." Instead, they refer to the "board," which is defined as "the board of supervisors of the county, or the same body acting as the governing board of a special district whose affairs and finances are under its supervision and control." (§ 29001, subd. (c).)

Sections 29000 to 29093 expressly delegate authority over the county budget to the board: "On or before June 10th of each year, as the board directs, each official or person in charge of any budget unit shall file with the auditor an itemized estimate of available financing, financing requirements, and any other matter required by the board." (§ 29040.) From the estimates the county auditor shall prepare a tabulation that "shall be submitted to the board . . . ." (§ 29062; see § 29060.) "Upon receipt of the tabulation the board shall consider it and . . . shall make any revisions, reductions or additions therein that it deems advisable." (§ 29063.) "On or before July 20th of each year the board, by formal action, shall approve the tabulation with the

revisions, additions and changes in conformity with its judgment and conclusions as to a proper financial program for the budget period, whereupon it shall constitute the proposed budget for the period to which it is to apply." (§ 29064, subd. (a).) On or before August 20 of each year, the "board" shall conduct a public hearing "at which meeting any member of the general public may appear and be heard regarding any item in the proposed budget or for the inclusion of additional items." (§ 29080.) In addition, at the meeting "[a]ny official whose estimates have been or are proposed to be revised, reduced, or increased, or who desires to change his or her estimates, shall be given the opportunity to be heard thereon." (*Ibid.*) "After the conclusion of the hearing, and not later than August 30 of each year, and after making any revisions of, deductions from, or increases or additions to, the proposed budget it deems advisable during or after the public hearing, the board shall by resolution adopt the budget as finally determined." (§ 29088, subd. (a).)

In *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 505 [247 Cal.Rptr. 362, 754 P.2d 708], our Supreme Court noted that "the term 'legislative body' is more easily read as including the electorate than the terms 'city council' or 'board of supervisors.'" The court reasoned "that the Legislature's use of the terms 'board of supervisors' and 'city council' in section 66484.3 gives rise to a strong inference that the Legislature intended to preclude exercise of the statutory authority by the electorate." (*Ibid.*) By the same reasoning, the Legislature's use of the term "board" in sections 29000 to 29093 gives rise to a strong inference that the Legislature intended to preclude the electorate from exercising authority over the adoption of a county budget.

Indeed, the term "board" in sections 29000 to 29093 cannot be reasonably interpreted as including the electorate. The auditor cannot submit his tabulation each year to the electorate for approval. Because the electorate can only cast their ballots at the polls, they do not have the means to "consider" the tabulation and "make any revisions, reductions or additions therein that [they] deem[] advisable." (§ 29063.) Nor can the electorate adopt a proposed budget by approving "the tabulation with the revisions, additions and changes in conformity with [their] judgment and conclusions as to a proper financial program for the budget period . . . ." (§ 29064, subd. (a).) Moreover, the electorate cannot conduct a public hearing and, following the hearing, "by resolution adopt" a final budget "after making any revisions of, deductions from, or increases or additions to, the proposed budget it deems advisable . . . ." (§ 29088, subd. (a).)

In the area of public safety, the Legislature has expressly recognized the board of supervisors' exclusive budgetary authority over the district attorney and sheriff. Section 25303 provides, "The board of supervisors shall not

obstruct the investigative function of the sheriff of the county nor shall it obstruct the investigative and prosecutorial function of the district attorney of a county." The section goes on to state, "Nothing contained herein shall be construed to limit the budgetary authority of the board of supervisors over the district attorney or sheriff."

### County Budgets for Public Safety Agencies Are a Statewide Concern

■ " '[A]n intent to exclude ballot measures is more readily inferred if the statute addresses a matter of statewide concern rather than a purely municipal affair.' This is so because the Legislature's constitutional authority to restrict the local right of initiative or referendum generally derives from its partial preemption of local government authority pursuant to the fulfillment of a state mandate or objective. [Citation.] Only in matters that transcend local concerns can the Legislature have intended to convert the city and county governing bodies into its exclusive agents for the achievement of a 'legislative purpose of statewide import.' [Citation.]" (*DeVita, supra,* 9 Cal.4th at p. 780.) "The state's plenary power over matters of statewide concern is sufficient authorization for legislation barring local exercise of initiative and referendum as to matters which have been specifically and exclusively delegated to a local legislative body." (*Committee of Seven Thousand v. Superior Court, supra,* 45 Cal.3d at pp. 511–512.)

County budgets for public safety agencies are of particular statewide concern. Such budgets involve the use of state funds provided pursuant to Proposition 172. Each county must establish a Public Safety Augmentation Fund in its treasury to receive the Proposition 172 funds. (§ 30055.) Section 30056, subdivision (e), provides: "The Legislature finds and declares that the allocation of the Public Safety Augmentation Fund is a matter of statewide concern and is not merely a municipal affair or a matter of local interest." Moreover, the people of the state have declared in the state Constitution that "[p]ublic safety services are critically important to the security and well-being of the State's citizens and to the growth and revitalization of the State's economic base." (Cal. Const., art. XIII, § 35, subd. (a)(1); see also *Rivero v. Superior Court* (1997) 54 Cal.App.4th 1048, 1059 [63 Cal.Rptr.2d 213] ["[i]nvestigation and prosecution of state criminal law are statewide concerns, not municipal affairs"].)

Furthermore, since county budgets for public safety agencies constitute a major portion of county spending, such budgets are of statewide concern because they may affect a county's ability to adequately fund state-mandated programs unrelated to public safety. Counties are generally responsible for funding local programs mandated by state legislation enacted before January

1, 1975. Pursuant to article XIII B, section 6 of the California Constitution, the state is required to reimburse the counties for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon them by state legislation enacted after January 1, 1975. (See *Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th 1564, 1577–1581 [15 Cal.Rptr.2d 547].)[6]

Some examples of pre-1975 legislation mandating county funded programs are as follows: (1) Welfare and Institutions Code section 850, which provides that "[t]he board of supervisors in every county shall provide and maintain, at the expense of the county, . . . a suitable house or place for the detention of wards and dependent children of the juvenile court and of persons alleged to come within the jurisdiction of the juvenile court." (2) Elections Code section 13001, subdivision (a), which provides: "All expenses authorized and necessarily incurred in the preparation for and conduct of elections as provided in this code shall be paid from the county treasuries, except that when an election is called by the governing body of a city the expenses shall be paid from the treasury of the city." (3) Welfare and Institutions Code section 17000, which "requires counties to relieve and support ' "*all indigent persons* lawfully resident therein, 'when such persons are not supported and relieved by their relatives' or by some other means." ' [Citations.]" (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 100 [61 Cal.Rptr.2d 134, 931 P.2d 312], italics added by *Mooney v. Pickett* (1971) 4 Cal.3d 669, 678 [94 Cal.Rptr. 279, 483 P.2d 1231].) "[C]ounties have no discretion to refuse to provide medical care to 'indigent persons' within the meaning of [Welfare and Institutions Code] section 17000 who do not receive it from other sources." (*Id.*, at p. 101, fn. omitted.)

In adopting a budget, the board of supervisors must strike a balance between public safety needs and the county's obligation to fund state-mandated programs unrelated to public safety. In our view, it is a matter of statewide concern that a proper balance be struck to ensure adequate funding in both areas.

---

[6] Section 6, subdivision (a), of article XIII B provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service, except that the Legislature may, but need not, provide a subvention of funds for the following mandates: [¶] (1) Legislative mandates requested by the local agency affected. [¶] (2) Legislation defining a new crime or changing an existing definition of a crime. [¶] (3) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

*Sections 4 and 5 of the Ordinance Seriously Impair the
Exercise of Essential Governmental Functions*

■ The mere fact that county budgets for public safety agencies are of statewide concern does not mean that sections 29000 to 29093 were intended to preclude initiative action by the electorate. Courts are not "to automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present." (*DeVita, supra,* 9 Cal.4th at pp. 780–781.) "[I]t is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decision making [*sic*] implies a legislative intent to bar the right of initiative. Rather, courts must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body." (*Id.*, at p. 781.)

In *DeVita* our Supreme Court noted that in some cases "exclusive delegation was inferred in part on the grounds that the Legislature must have intended to prevent disruption of routine operations of government." (*DeVita, supra,* 9 Cal.4th at p. 781.) As an example of such cases, it cited *Geiger v. Board of Supervisors* (1957) 48 Cal.2d 832 [313 P.2d 545]. In *Geiger* the Butte County Board of Supervisors adopted an ordinance levying a sales and use tax. The *Geiger* court concluded that the ordinance was not subject to referendum because application of the referendum process would seriously impair "essential governmental functions." (*Id.*, at p. 839.) The *Geiger* court reasoned: "An essential function of a board of supervisors is the management of the financial affairs of county government, which involves the fixing of a budget to be used as the basis for determining the amount and rate of taxes to be levied. Before the board can properly prepare a budget, it must be able to ascertain with reasonable accuracy the amount of income which may be expected from all sources, and, when it has adopted ordinances imposing taxes, it cannot make an accurate estimate unless it knows whether the ordinances will become effective. These are some of the reasons why the people have entrusted to their elected representatives the duty of managing their financial affairs and of prescribing the method of raising money." (*Id.*, at p. 840.) In *Rossi v. Brown* (1995) 9 Cal.4th 688, 703 [38 Cal.Rptr.2d 363, 889 P.2d 557], our Supreme Court stated that in *Geiger* it had reasoned that "[m]anaging the county government's financial affairs . . . was entrusted to elected representatives, and was an essential function of the board which could not accurately estimate income if tax ordinances were subject to referenda. [Citation.]"

The *Geiger* court recognized that the fixing of a budget is included within the board of supervisors' essential function of managing county financial affairs. Because of their experience in government and knowledge of local conditions and interests, members of the board of supervisors are particularly well qualified to make budgeting decisions. "The budgetary process entails a complex balancing of public needs in many and varied areas with the finite financial resources available for distribution among those demands. It involves interdependent political, social and economic judgments which cannot be left to individual officers acting in isolation; rather, it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available." (*County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 699 [222 Cal.Rptr. 429].) Moreover, "[t]he statutes of the state provide for detailed statements to be presented to the supervisors by the various county officers at stated intervals to the end that the board may be constantly aware of the financial condition of the county and the needs thereof." (*Ferguson v. Gardner* (1927) 86 Cal.App. 421, 428 [260 P. 961].) On the other hand, "voters are not immersed in day-to-day government so as to be able to make reasoned judgments on the complex financial management of government, e.g., the interplay of various appropriations on a budget. The voters do no qualify as comptrollers." (*Convention, etc. v. Dist. of Columbia, etc.* (D.C. 1981) (en banc) 441 A.2d 889, 925 (dis. opn. of Gallagher, J.).)

Sections 4 and 5 of the Ordinance seriously impair the exercise of appellant's essential governmental function of managing the county's financial affairs. These sections require appellant to fund county public safety agencies at a level at least equivalent to their budgets for the 1995–1996 fiscal year, "plus any associated inflationary costs." (Ordinance, § 4.) Appellant would have no discretion to decrease public safety funding below this level if the crime rate plummeted, if improved efficiency or innovations reduced public safety costs, or if the required level of public safety funding prevented the county from adequately funding state-mandated programs unrelated to public safety.

*Sections 4 and 5 of the Ordinance Exceed the Initiative*
*Power of the Electorate and Are Constitutionally Invalid*

██ We conclude that, in enacting sections 29000 to 29093, the Legislature intended that the authority to adopt budgets for county public safety agencies be exercised specifically and exclusively by the board of supervisors, barring use of the local initiative power. Our conclusion is based on the following factors: (1) statutory language in sections 29000 to 29093 expressly delegates authority over the county budget to the board of supervisors; (2) county budgets for public safety agencies are a matter of statewide

concern; and (3) as sections 4 and 5 of the Ordinance illustrate, application of the initiative process to county public safety budgets would seriously impair the board of supervisors' essential governmental function of managing the county's financial affairs. Sections 4 and 5 of the Ordinance, therefore, exceed the initiative power of the electorate and are constitutionally invalid.[7]

Our conclusion is supported by *Citizens for Jobs & the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311 [115 Cal.Rptr.2d 90]. In *Citizens* the electorate of Orange County approved an initiative measure providing that the approval of certain land use projects by the board of supervisors would not be valid unless ratified by a two-thirds vote of the electorate. Until ratification, restrictions were imposed on the board's spending of funds for purposes related to the projects. The *Citizens* court determined that the measure was "clearly beyond the power of the electorate" for several reasons, one of which was that "[i]t interferes with the essential government functions of fiscal planning and land use planning . . . ." (*Id.*, at p. 1324.) The *Citizens* court noted that in *Rossi v. Brown, supra,* 9 Cal.4th at page 703, our Supreme Court had "referred to reasoning it had developed in *Geiger v. Board of Supervisors[, supra,* 48 Cal.2d at pp. 839–840], to the effect that managing a county government's financial affairs has been entrusted to elected representatives, such as a county board of supervisors, and was an essential function of the board." (*Citizens*, at p. 1331.) The *Citizens* court concluded that the initiative measure "impermissibly intrudes into Board prerogatives, particularly with respect to the functions of the Board in managing its financial affairs . . . ." (*Ibid*; see also *Carlson v. Cory* (1983) 139 Cal.App.3d 724, 731 [189 Cal.Rptr. 185] ["neither the initiative nor the referendum may be used in a manner which interferes with a local legislative body's responsibility for fiscal management"].)

---

[7] In view of our conclusion that the Legislature intended to preclude initiative by delegating authority exclusively to the board of supervisors, we need not consider appellant's alternative argument that, "because the board cannot pass an ordinance that attempts to control appropriations made in future county budgets, the electorate cannot do so, either." In making this argument, appellant relies principally on *McCafferty v. Board of Supervisors* (1969) 3 Cal.App.3d 190 [83 Cal.Rptr. 229], and *People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 328–329 [226 Cal.Rptr. 640]. But see *Rossi v. Brown* (1995) 9 Cal.4th 688, 715–716 [38 Cal.Rptr.2d 363, 889 P.2d 557], where our Supreme Court observed that the people's power of initiative is greater than the power of legislative bodies because the people may bind future legislative bodies: "The people's reserved power of initiative *is* greater than the power of the legislative body. The latter may not bind future Legislatures [citation], but by constitutional and charter mandate, unless an initiative measure expressly provides otherwise, an initiative measure may be amended or repealed only by the electorate. Thus, through exercise of the initiative power the people *may* bind future legislative bodies other than the people themselves. [Citations.]"

*Distinguishable Cases*

In support of their position, respondents and amicus curiae Howard Jarvis Taxpayers Association, cite *Johnson v. Bradley* (1992) 4 Cal.4th 389 [14 Cal.Rptr.2d 470, 841 P.2d 990]. In *Johnson* the voters of the City of Los Angeles amended the city charter to provide "for partial public funding of city political campaigns, and, correspondingly, spending limits on candidates who accept public funds." (*Id.*, at p. 393.) The charter amendment conflicted with section 85300, added by Proposition 73 in 1988. The section provides: "No public officer shall expend and no candidate shall accept any public moneys for the purpose of seeking elective office." The *Johnson* court considered whether section 85300 "qualifies as a matter of 'statewide concern.' If the state statute does not qualify as a matter of statewide concern, the conflicting charter city measure . . . is a 'municipal affair' and ' "beyond the reach of legislative enactment." ' [Citation.]" (*Johnson v. Bradley, supra,* 4 Cal.4th at p. 404.)

Opponents of the charter amendment argued that section 85300 involves a matter of statewide concern because "there is a legitimate statewide concern in how local tax proceeds are expended." (*Johnson v. Bradley, supra,* 4 Cal.4th at p. 407.) Our Supreme Court rejected this argument: "On this point, we agree with the Court of Appeal below, which observed, '[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions.' [The charter amendment] expressly limit[s] the monies to be utilized for campaign financing to city funds. Thus, payments received by the city from state or federal governmental agencies may not be used. These are the city taxpayers' own dollars and those taxpayers, together with their city council, have voted to utilize those dollars to help finance political campaigns for city elective offices as a central if not critical part of major political campaign and ethics reform. That Proposition 73 expressly dealt with this subject and intended that its prohibition extend to campaigns and candidates for local office does not convert the decision of the City of Los Angeles, to follow a different path with its own money, into a matter of statewide concern." (*Ibid.*)

*Johnson* is distinguishable. Unlike the instant case, the issue in *Johnson* was not whether the Legislature had intended "to delegate the exercise of . . . authority exclusively to the [local] governing body, thereby precluding initiative and referendum. [Citation.]" (*DeVita, supra,* 9 Cal.4th at p. 776.) The issue in *Johnson* was whether, despite a conflicting state statute, a charter city

could amend its charter to provide funding exclusively from city revenues to finance city political campaigns. *Johnson* did not involve a general law county such as the County of Ventura. The conflicting statute—section 85300—did not seek to accomplish an objective of statewide concern. It had nothing to do with public safety services. Unlike the present case, there is no indication in *Johnson* that the charter amendment might impinge upon the city's ability to adequately fund state-mandated programs. In addition, there is no indication in *Johnson* that the charter amendment would seriously impair the local governing body's ability to manage the city's financial affairs.

*Kugler v. Yocum* (1968) 69 Cal.2d 371 [71 Cal.Rptr. 687, 445 P.2d 303] is also distinguishable. In *Kugler* our Supreme Court concluded that a proposed ordinance was a proper subject for the exercise of the initiative power by the voters of the City of Alhambra. The proposed ordinance provided "that in setting the salaries of the firemen [of the City of Alhambra], the [city] council could not fix them at an amount less than the average of the salaries received by the firemen of the City of Los Angeles and the salaries received by the firemen of the County of Los Angeles." (*Kugler v. Yocum, supra,* 69 Cal.2d at p. 374.) Our Supreme Court reasoned: "[T]he subject matter of the proposed ordinance, that is the salaries of city firemen, falls within the electorate's initiative power. The city charter provides that the 'Council . . . shall have the power to . . . establish . . . the amount of the [the fire division's] . . . salaries' . . . and that the 'electors . . . shall have the right to . . . adopt . . . any ordinance which the council might enact' (§ 176.) . . . [W]age rates are a proper subject for adoption as an ordinance by a city council and, accordingly, pursuant to section 176, for enactment by an initiative." (*Ibid.,* citations omitted.)

In contrast to sections 4 and 5 of the Ordinance, the proposed ordinance in *Kugler* did not establish a minimum annual budget for the fire department. It merely set minimum wage rates for firemen. The city council could control the fire department's budget by increasing or decreasing the number of firemen.

Similarly *Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233 [12 Cal.Rptr.3d 798], is distinguishable. There, the voters of the City and County of San Francisco (hereafter City) adopted an initiative ordinance requiring that the City "replace the bulk of outright cash grants to homeless recipients with in-kind benefits for housing, utilities and meals, to the extent such services are available." (*Id.,* at p. 237.) Prior to the adoption

of the initiative ordinance, "the board of supervisors had enacted G.A. [general assistance] eligibility standards that afforded a qualified eligible indigent resident a maximum cash subsistence grant of $320 per month. . . . [¶] The . . . initiative did not change the maximum monthly amount of aid to which qualified G.A. recipients are entitled. [Citation.]" (*Id.*, at p. 239, fn. omitted.)

The appellate court rejected the argument "that under Welfare and Institutions Code section 17001, only the board of supervisors—not the voters—could enact the [ordinance]." (*Pettye v. City and County of San Francisco, supra,* 118 Cal.App.4th at p. 237, fn. omitted.) Welfare and Institutions Code section 17001 "directs that standards of aid and care for G.A. recipients shall be adopted by '[t]he board of supervisors of each county, or the agency authorized by county charter . . . .' " (118 Cal.App.4th at p. 245.) The *Pettye* court reasoned that the statutory language "is inconclusive on the matter of delegation. While a reference to a specific entity such as the board of supervisors gives rise to a stronger inference than a generic reference to governing or legislative body, here we have a specific reference coupled with a more general reference to whatever entity might be designated in a county charter to perform such task. The inference with respect to the latter is that the Legislature trusted whatever vehicle or entity a home rule county designated." (*Ibid.*) On the contrary, sections 29000 to 29093 specifically refer to the board of supervisors as the sole entity vested with budget-making power.

The *Pettye* court further reasoned that it is not a matter of statewide concern whether general assistance benefits are provided in kind or in cash, so long as the benefits are adequate. "Here, if the question is whether the welfare of the indigent poor is a statewide concern, the answer is yes. But if the question is whether, because of the magnitude and uniqueness of the single homeless adults congregating in San Francisco, the City emphasizes a G.A. program that provides 'care' instead of 'cash' grants, the issue looks very local." (*Pettye v. City and County of San Francisco, supra,* 118 Cal.App.4th at p. 246.) Unlike sections 4 and 5 of the Ordinance, the initiative ordinance in *Pettye* did not prescribe a minimum annual budget for general assistance relief.

*Conclusion*

Section 1 of the judgment, which upholds the validity of sections 4 and 5 of the Ordinance, is reversed. Sections 4 and 5 of the Ordinance are constitutionally invalid. This reversal renders section 2 of the judgment inoperative. In all other respects, the judgment is affirmed. Pursuant to paragraph 5 at pages 8 to 9 of the Agreement, appellant shall recover its costs on appeal from the City of Thousand Oaks and Citizens for a Safe Ventura County.

Gilbert, P. J., and Coffee, J., concurred.

Respondents' petitions for review by the Supreme Court were denied August 16, 2006, S144692.