Filed 7/28/23; Certified for Publication 7/31/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COALITION OF COUNTY UNIONS, et al., | B314973 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 20STCP04019) |
| v. | |
| LOS ANGELES COUNTY BOARD OF SUPERVISORS, et al., | |
| Defendants and Appellants; | |
| RE-IMAGINE LOS ANGELES COUNTY COALITION, et al., | |
| Intervenors and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary Strobel, Judge. Reversed with directions.

Office of County Counsel, Peter M. Bollinger and Michael S. Buennagel; Kendall Brill & Kelly, Laura W. Brill, and David T. Freenock, for Defendants and Appellants.

Strumwasser & Woocher, Dale K. Larson, Fredric D. Woocher, Salvador E. Perez, and Julia Michel, for Intervenors and Appellants.

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk, and Paul Gough, for Plaintiffs and Respondents.

———————————

In November 2020, the voters of Los Angeles County (County) amended the County charter by enacting Measure J. The charter amendment adopted by Measure J requires the County Board of Supervisors (Board) to annually allocate at least 10 percent of the County's locally generated unrestricted revenues in the general fund to direct community investment (such as youth programs, job training, rental assistance, and affordable housing) and alternatives to incarceration (including health, mental health, and substance use disorder programs). The charter amendment also specifically prohibits Measure J funds from being allocated to any carceral system or law enforcement agency.

Immediately after Measure J's enactment, a coalition of County employee unions and two individuals filed a petition for a peremptory writ of mandate prohibiting the Board, the Los Angeles County Auditor (auditor), and the Los Angeles County Chief Executive Officer (CEO) from enforcing the charter amendment. The trial court granted the petition, concluding that the amendment would severely impair the County's ability to

2

exercise essential government functions, including managing the County's budget and protecting public safety, which were matters of statewide concern.

We reverse. Article XI, section 4, subdivision (g) of the California Constitution provides that if a county has adopted a charter for its own governance, "the general laws adopted by the Legislature in pursuance of Section 1(b) of this article, *shall, as to such county, be superseded by said charter* as to matters for which, under this section it is competent to make provision in such charter, and for which provision is made therein, except as herein otherwise expressly provided." (Italics added.) Such matters include "[t]he performance of functions required by statute" (*id*. art. XI, § 4, subd. (d) (§ 4(d)) and "[t]he powers and duties of governing bodies and all other county officers" (*id*., art. XI, § 4, subd. (e) (§ 4(e)). Because the charter amendment enacted by Measure J defines a "power" (allocating locally generated unrestricted revenues) and a "duty" (directing 10 percent of such revenues to particular purposes) of the County's "governing bod[y]" (the Board)—and because it concerns "[t]he performance of functions required by statute" (adopting a budget)—it is a permissible exercise of the County's authority to amend its charter. Further, contrary to petitioners' contentions, the amendment neither impairs the exercise of essential government functions nor violates state law. Measure J thus is enforceable, and we therefore will reverse the judgment granting the petition for writ of mandate.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     Adoption of Measure J by Los Angeles County voters.

In July 2020, the Board adopted a resolution placing Measure J, a proposal to amend the Los Angeles County Charter (Charter), on the November 2020 ballot.  Measure J asked County voters to decide whether the Charter should be amended to require the County to "annually allocat[e] in the County's budget no less than ten percent (10%) of the County's locally generated unrestricted revenues in the general fund to address the disproportionate impact of racial injustice through community investment and alternatives to incarceration and prohibit[] using those funds for carceral systems and law enforcement agencies as detailed in the ordinance adopting the proposed charter amendment."

The accompanying ordinance proposed amending article III, section 11 of the Charter as follows:

"It shall be the duty of the Board of Supervisors:  [¶] . . . [¶] (8) To allocate, in compliance with all laws and regulations, the County's locally generated unrestricted revenues in the general fund as follows:

"A.     Set aside a baseline minimum threshold of at least ten percent (10%) of the County's locally generated unrestricted revenues in the general fund (Net County Cost), as determined annually in the budget process or as otherwise set forth in the County Code or regulations, to be allocated on an annual basis, after input from, among others, the public and County departments at a public hearing, for the following primary purposes:

4

"i.     Direct Community Investment.

"1.     Community-based youth development programs.

"2.     Job training and jobs to low-income residents focusing on jobs that support the implementation of the 'Alternatives to Incarceration' workgroup recommendations as presented to the County Board of Supervisors on March 10, 2020, especially construction jobs for the expansion of affordable and supportive housing, restorative care villages, and a decentralized system of care.

"3.     Access to capital for small minority-owned businesses, with a focus on Black-owned businesses.

"4.     Rent assistance, housing vouchers and accompanying supportive services to those at risk of losing their housing, or without stable housing.

"5.     Capital funding for transitional housing, affordable housing, supportive housing, and restorative care villages with priority for shovel-ready projects.

"ii.     Alternatives to incarceration.

"1.     Community-based restorative justice programs.

"2.     Pre-trial non-custody services and treatment.

"3.     Community-based health services, health promotion, counseling, wellness and prevention programs, and mental health and substance use disorder services.

"4.     Non-custodial diversion and reentry programs, including housing and services.

"B.     The set aside shall not be used for any carceral system or law enforcement agencies, including the Los Angeles County Sheriff's Department, Los Angeles County District Attorney's Office, Los Angeles County Superior Courts, or

5

Los Angeles County Probation Department, including any redistribution of funds through those entities. This restriction does not extend to State law requiring the County to fund court facilities and expenditures, including but not limited to, the Trial Court Facilities Act of 2002 (2002 Senate Bill No. 1732) and Lockyer-Isenberg Trial Court Funding Act of 1997 (1997 Assembly Bill No. 233), other mandatory fines and fees, or any other County commitments to the extent required by law.

"C.    The unrestricted revenues that are set aside shall phase in over a three-year period, beginning July 1, 2021, and incrementally grow to the full set-aside by June 30, 2024, pursuant to the procedures codified in the County Budget Act in the Government Code.

"D.    The set-aside cannot supplant monies otherwise allocated for the same categories listed in Subsection (8)(A), as defined and set forth in the County Code or regulations.

"E.    The Board of Supervisors shall establish an inclusive and transparent process on the allocation of funds set aside by this Subsection (8).

"F.    Notwithstanding this Subsection (8), the Board of Supervisors may, by a four-fifths vote, reduce the set-aside in the event of a fiscal emergency, as declared by the Board of Supervisors, that threatens the County's ability to fund mandated programs."

On November 30, 2020, the Los Angeles County Registrar of Voters certified that Measure J had been approved by the voters.

## II.   Petition for writ of mandate.

On December 8, 2020, the Coalition of County Unions[1] and two individual taxpayers (collectively, Coalition) filed a petition for writ of mandate against the Board, auditor, and CEO seeking to invalidate Measure J on the ground that the voters lacked constitutional and statutory authority to require the Board and County officers to take specific budget actions.

The Coalition asserted, first, that the matters that may be included in a county's charter are limited to those enumerated in article XI, section 4 of the State Constitution.  Because "[n]o provision of article XI, section 4 authorizes a county charter to prescribe the duties of [a board of supervisors, auditor, or CEO] in connection with the county budget or the mandatory allocation of revenue to any specific county program," the Coalition urged that Measure J is unconstitutional.  The Coalition further contended that the Board's specific powers and duties with respect to County budgets derive from the County Budget Act, Government Code[2] section 29000 et seq. (County Budget Act). Pursuant to the County Budget Act, the Board, auditor, and CEO "each have a specific role in crafting and ultimately enacting the annual County budget."  Measure J "conflicts with the powers and duties of" the Board, auditor, and CEO as set forth in the County Budget Act because Measure J requires the Board and these individuals to "comply with the dictates of Measure J,

---

[1]     The Coalition of County Unions is a group of 14 member unions representing Los Angeles County employees, including the Association for Los Angeles Deputy Sheriffs.

[2]     All subsequent undesignated statutory references are to the Government Code.

7

regardless of the public testimony . . . , the requests of [the] department heads, . . . [and] the [Board's] own determination of whether it deems the mandated expenditures advisable." Finally, the Coalition urged that Measure J seriously impairs the Board's exercise of its essential government function of managing the county's financial affairs and "unlawfully binds the hands of future Boards."

## III.   Answer and opposition to petition for writ of mandate.

The Board filed an answer and opposition to the mandate petition.  First, it asserted that county charters are constitutionally permitted to address budgeting.  Second, under California Supreme Court authority, a court should find a matter delegated exclusively to a local governing body, not to the voters, *only* if the Legislature clearly said so in connection with a matter of "statewide concern."  Measure J, the Board said, was "carefully designed to avoid interference with anything beyond an issue of local concern" and "does not interfere with any statewide law, policy, or State direction over the use of funds" because it does not affect the allocation of "restricted County expenditure[s]" or "non-locally-generated funds."  Moreover, the charter amendment enacted by Measure J "does not prevent the County's Board of Supervisors from directing the budget . . . [or] complying with State or Federal budget requirements," and it "does nothing to undermine the State-law-regulated procedure by which the County's budget is allocated."  Indeed, the Board said, the amendment does not impose any requirements in conflict with the County Budget Act, and it allows the Board, by a four-fifths vote, to reduce the set-aside in the case of a fiscal emergency that might affect mandated programs.

8

In connection with its opposition, the Board submitted the declaration of County Senior Assistant CEO Matthew McGloin. McGloin noted that the charter amendment enacted by Measure J required a set-aside of a portion of "the County's locally generated unrestricted revenues in the general fund (Net County Cost)." (Italics omitted.)  The amendment did not define this term, but McGloin said County expenditures are restricted in a variety of ways, including by constitutional requirements to provide services such as public and mental health services, social services, indigent defense, property tax assessment, and public safety services; "maintenance of effort" requirements, which require the County to meet defined funding or services levels as a condition of receiving state or federal funding; contracts with unions requiring the County to provide specific salaries and benefits for County employees; and judgments entered against the County.  McGloin estimated that the County's total budget for the 2021–2022 budget year would exceed $36 billion, of which approximately $3 billion would qualify as "locally generated unrestricted revenues."  Based on that estimate, the fully-implemented Measure J set-aside based on anticipated 2021–2022 revenue would be approximately $300 million.[3]

---

[3]     McGloin noted that Measure J provided for the set-aside to be phased in over three years.   The $300 million estimate assumed a fully implemented set-aside.

9

## IV. Judgment granting petition for peremptory writ of mandate.

On July 7, 2021, the trial court granted an application to intervene filed by Re-Imagine Los Angeles County Coalition (Re-Imagine LA)[4] and Thomas Newman (collectively, intervenors).

After a hearing, the court granted the petition for writ of mandate. It explained its ruling as follows:

Los Angeles County is a charter county. As such, it " 'has only those powers and can enact within its charter only those provisions authorized by the Constitution. These include those enumerated in article XI, section 4 [of the California Constitution].' "

In *DeVita v. County of Napa* (1995) 9 Cal.4th 763 (*DeVita*), the California Supreme Court set forth the standard for determining when the electorate's initiative and referendum rights have been restricted by the state Legislature. Under *DeVita*, courts must presume, absent a clear showing of the Legislature's intent to the contrary, that the legislative decisions of a city council or board of supervisors are subject to amendment

---

[4] Re-Imagine LA is a coalition of 13 organizations making up the Coalition Coordinating Committee and 131 organizational members. The 13 committee members are: The Advancement Project of California, Bend the Arc, Black Lives Matter L.A., Brilliant Corners, Community Coalition, CURB, Dignity & Power Now, La Defensa, Los Angeles Black Worker Center, TransLatin Coalition, the United Way of Greater Los Angeles, White People 4 Black Lives, and the Youth Justice Coalition.

by the voters through initiative and referendum.[5]  The presumption in favor of the rights of initiative and referendum " 'is rebuttable upon a definite indication that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right' " by delegating authority exclusively to a local governing body.  To determine whether the Legislature so intended, a court must consider the relevant statutory language, whether the subject at issue is a matter of " 'statewide concern,' " and whether submitting an issue to the voters would seriously impair the Board's exercise of an essential government function.

As relevant here, the County Budget Act directs that a variety of budget-related tasks shall be performed by "the board." Citing *Totten v. Board of Supervisors* (2006) 139 Cal.App.4th 826 (*Totten*), the court found that this statutory language " 'gives rise to a strong inference that the Legislature intended to preclude the electorate from exercising authority over the adoption of a county budget.' "  Further, the court said, county budgeting for law enforcement agencies is a matter of statewide concern, and Measure J constrains the Board's discretion relating to funding of those agencies.  As a result, Measure J "could potentially have an indirect impact on [the] County's ability to budget for state-mandated programs" and "could also prevent [the Board] from spending substantial discretionary funds on public safety, even if the Board otherwise deemed such expenditures necessary for public safety or welfare."

---

[5]	The trial court noted that Measure J was placed on the ballot by the Board, not by voter initiative.  It found that *DeVita* nonetheless was an appropriate framework by which to analyze Measure J's asserted conflict with state law.

11

Finally, the court concluded that Measure J would seriously impair the Board's exercise of the essential government function of managing the County's financial affairs and allocating funds for law enforcement agencies. The court noted that " '[a]n essential function of a board of supervisors is the management of the financial affairs of county government, which involves the fixing of a budget,' " and Measure J "will meaningfully and substantively reduce Board discretion over County funds." Further, the court said, a charter amendment "similar to Measure J – but restricting a greater percentage of unrestricted locally generated revenues – could essentially eliminate the Board's discretionary county budgeting and spending decisions." This limitation on the Board's discretion was not mitigated by the amendment's fiscal emergency provision because "[the] Board would still lack authority to appropriate the set-aside funds for public safety agencies if [the] Board, in its discretion and by majority vote, found that conditions required additional public safety funding. Only a supermajority of the Board can *temporarily* suspend Measure J. Thus, this clause would not guarantee that [the] Board could suspend Measure J if necessary to fund mandated programs."

The court entered a judgment granting the petition for writ of mandate on August 16, 2021. The Board and intervenors timely appealed.

## DISCUSSION

The fundamental question raised by this appeal is whether a county may adopt a charter provision that restricts its board of supervisors' discretion over the county's budget. The Coalition asserts, and the trial court concluded, that the charter amendment adopted by Measure J is unenforceable because it

12

conflicts with state laws that give unfettered discretion over county budgeting to the Board.  The County and intervenors disagree, contending that charter provisions supersede state law with regard to county management, and in any event the amendment is consistent with state law.

As we discuss, the California Constitution permits counties to adopt charters for their own governance.  County charter provisions supersede state law "as to matters for which [counties] . . . [are] competent to make provision in such charter."  (Cal. Const., art. XI, § 4, subd. (g).)  Those matters include the "[t]he performance of functions required by statute" and the "powers and duties of governing bodies and all other county officers."  (*Id.*, §§ 4(d), (e).)  Because the Charter amendment enacted by Measure J defines the powers of the County's Board in the context of adopting a budget—and because it does not incapacitate the County from performing any functions required by statute—it is a valid exercise of the County's constitutional authority.  Moreover, contrary to the Coalition's contention, the amendment is not inconsistent with state law.  We therefore find no impediment to implementing Measure J.[6]

## I.     Standard of review.

We independently review the validity of measures adopted by the voters.  (*People v. Lippert* (2020) 53 Cal.App.5th 304, 311;

---

[6]     We decline the Board's and intervenors' requests for judicial notice, filed June 23, 2022, because none of the documents of which judicial notice is sought is relevant to our resolution of the appeal.  (See *JPMorgan Chase Bank, N.A. v. Superior Court* (2022) 85 Cal.App.5th 477, 498, fn. 6 [" 'An appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal" ' "].)

13

*California Family Bioethics Council, LLC v. California Institute for Regenerative Medicine* (2007) 147 Cal.App.4th 1319, 1338.) A voter-adopted measure " ' " 'must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears.' " ' (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 574.) For a facial challenge to succeed, [a challenger] must demonstrate 'the challenged portion will result in legally impermissible outcomes "in the generality or great majority of cases." ' " (*Alliance for Responsible Planning v. Taylor* (2021) 63 Cal.App.5th 1072, 1084, citing *Larson v. City and County of San Francisco* (2011) 192 Cal.App.4th 1263, 1280, and *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 673.) "Under this test, 'we may not invalidate a [measure] simply because in some future hypothetical situation constitutional problems may arise . . . .' (*California Teachers Assn. v. State of California* (1999) 20 Cal.4th 327, 347.) Conversely, we may not ' "uphold the law simply because in some hypothetical situation it might lead to a permissible result." ' " (*Alliance for Responsible Planning*, at p. 1084.)

## II. Measure J is a permissible exercise of the County's constitutional power to amend its charter.

### A. Constitutional provisions governing county governance and county "home rule."

Article XI, section 1 of the California Constitution divides the state into counties, "which are legal subdivisions of the State," and provides that the Legislature shall "provide for county powers . . . and an elected governing body in each county." (Cal. Const., art. XI, § 1, subds. (a)–(b).) A parallel provision,

14

article XI, section 2, grants the Legislature authority to provide for formation of cities and to "provide for city powers." Under the authority of these sections, the Legislature has enacted hundreds of statutes that regulate the powers and governmental structure of both counties and cities. (See *Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1206 (*Dibb*).)

Article XI, section 3 "allows for an alternative governmental structure" (*Dibb, supra*, 8 Cal.4th at p. 1206)— that is, for the adoption by a city or county of "a charter by majority vote of its electors voting on the question." (Cal. Const., art. XI, § 3, subd. (a).) Article XI, section 4 provides that a county charter shall provide for a governing body, elected sheriff, elected district attorney, elected assessor, and other county officers. (*Id.*, art. XI, § 4, subds. (a), (c).)[7] Additionally, and of particular relevance to this case, a county charter shall provide for "[t]he performance of functions required by statute" (*id.* art. XI, § 4(d)) and "[t]he powers and duties of governing bodies and all other county officers" (*id.*, art. XI, § 4(e)). Provisions of a charter "are the law of the State and have the force and effect of legislative enactments." (*Id.*, art. XI, § 3, subd. (a).)

Counties that have adopted charters, referred to as charter counties, "have all the powers that are provided by this Constitution or by statute for counties" (Cal. Const., art. XI, § 4, subd. (h))—that is, to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws" (*id.*, art. XI, § 7). If a county "has framed and adopted a charter, and the same shall have been approved by the Legislature as herein provided, the general laws

---

[7]    A parallel provision, article XI, section 5, concerns city charters.

adopted by the Legislature in pursuance of Section 1(b) of this article, *shall, as to such county*, *be superseded by said charter* as to matters for which, under this section it is competent to make provision in such charter, and for which provision is made therein, except as herein otherwise expressly provided." (*Id.*, art. XI, § 4, subd. (g), italics added.)

A county's charter may be amended, revised, or repealed "in the same manner" as it was originally adopted—i.e., by majority vote of the county's voters. (Cal. Const., art. XI, § 3, subd. (a).) Charter amendments may be proposed "by initiative or by the governing body." (*Id.*, art, XI, § 3, subd. (b).)

## B. Supreme Court decisions addressing purported conflicts between county charter provisions and state law.

Our Supreme Court has twice considered purported conflicts between county charters and state law. In *Reuter v. Board of Supervisors* (1934) 220 Cal. 314 (*Reuter*), the court addressed the interplay between state statutes that assigned road commissioner duties to county supervisors and a provision of the San Mateo County charter that assigned those same duties to the county engineer. A taxpayer challenged the charter provision, urging that the board of supervisors had exclusive jurisdiction over county roads and highways as a matter of state law, and the supervisors could not legally be divested of that jurisdiction by the county's charter. (*Id.* at pp. 318–319.)

The Supreme Court concluded that the charter provision was enforceable notwithstanding its "direct conflict with" state law. The court explained that under article XI, former section 7 1/2 (now, article XI, section 4(e)) of the California Constitution, counties were permitted through their

16

charters to provide for the powers and duties of boards of supervisors and all other county officers. (*Reuter*, *supra*, 220 Cal. at p. 320.) At the time section 7 1/2 was adopted, existing state law "fixed and defined the powers and duties of the board of supervisors and of each and every county officer in the state." (*Ibid*.) Accordingly, if the powers and duties of boards of supervisors and officers of charter counties were superseded by state law, then any attempt to provide for those powers and duties in the charter "would be an idle act and a useless expenditure of effort." (*Id*. at p. 321.) The court explained: "If these powers and duties as fixed by the charter conflicted in any way with those fixed by general laws then, . . . to the extent that they are inconsistent with those fixed by the general laws, they would be ineffective and void. If they did not so conflict with those fixed by the general laws, . . . the charter provisions fixing said powers and duties, though valid, would simply amount to a re-enactment of that which was already the law—a mere superfluous or idle act. We do not think the framers of the amendment, nor the people of the state who ratified it, contemplated any such absurd result." (*Ibid*.) Accordingly, the court said, the state Constitution necessarily permitted a county, by charter, "to provide for the duties of its officers *different from and inconsistent with* those provided by the general laws" (*id*. at p. 324, italics added), and thus the provision of the San Mateo County charter transferring the duties of road commissioners from the members of the board of supervisors to the county engineer "is a valid and constitutional charter enactment" (*id*. at p. 327).

In reaching this conclusion, the court distinguished the case before it from *Wilkinson v. Lund* (1929) 102 Cal.App. 767

17

(*Wilkinson*), which had addressed the enforceability of a provision of the Butte County charter that fixed the maximum property tax rate at two cents on the dollar. *Wilkinson* held that the challenged charter provision was unenforceable because it would incapacitate the county from performing essential functions imposed on it by the state such as law enforcement, public health, supporting dependent children, and maintaining roads and highways. (*Id.* at p. 773.) The *Reuter* court said *Wilkinson*'s holding was fully consistent with its own, explaining: "In [*Wilkinson*] the court was dealing entirely with public functions which had been delegated to the county by the Constitution, and which it was held the county could not by means of a charter incapacitate itself from performing. The present proceeding is not concerned with powers or duties of that character . . . . While the state may have a general interest in the roads and highways of the counties it is not concerned with the particular individual whose duty it is simply to employ the men and teams and other help necessary to construct and repair such roads and highways." (*Reuter*, *supra*, 220 Cal. at p. 325.)

The *Reuter* court concluded: "The general purpose of section 7 1/2 of article XI of the Constitution was to give local self-government or county home rule to counties of the state by means of charters framed under said constitutional amendment. . . . [¶] . . . [¶] The people of the state in the adoption of this amendment had good cause to believe, and evidently did believe, that they were thereby providing a means whereby they might have home rule in their local and county affairs, including the right, in the words of the amendment, to provide for the powers and duties of their county officers. The amendment as adopted by them, when construed as a whole, is

18

not only susceptible of such a construction, but cannot be given any other reasonable interpretation." (*Reuter*, *supra*, 220 Cal. at pp. 326–327.)

The court reaffirmed *Reuter*'s holding in *Dibb*, *supra*, 8 Cal.4th 1200. There, the voters of San Diego County had amended their county charter to create a "Citizens Law Enforcement Review Board" (CLERB) with subpoena powers to review complaints about county sheriffs. (*Id.* at p. 1204.) A taxpayer filed suit to enjoin the county from spending funds to implement the CLERB, asserting there was no legal authority for its creation and, in any event, a citizen review board could not lawfully be authorized to issue subpoenas. (*Id.* at p. 1205.) The trial court and Court of Appeal rejected the taxpayer's arguments, concluding that county voters were permitted by charter amendment to create the CLERB and to grant it subpoena power. (*Ibid.*)

The Supreme Court affirmed. It explained that because article XI, section 4, subdivision (h) of the Constitution provides that charter counties "shall have all the powers that are provided by this Constitution or *by statute* for [general law] counties," the CLERB was valid if there was statutory authority for its creation. (*Id.* at p. 1208.) The inverse was not true, however: That is, the *absence* of statutory authority was not dispositive of the county's power to create the CLERB because article XI, section 4(e) permits counties, through their charters, to provide "for the 'powers and duties of governing bodies and all other county officers,'" and section 3, subdivision (a) provides that such charter provisions "'supersede . . . all state laws inconsistent therewith.'" (*Dibb*, at p. 1211, italics omitted.) Thus, the court said, the proper inquiry was not whether state law expressly

19

permitted counties to create citizen review boards with subpoena powers, but instead whether the CLERB's creation was "properly grounded on the county's authority to provide for the 'powers and duties' of its local officers and the operation of its local government." (*Ibid.*) As to that issue, the relevant question was "not whether the Constitution expressly confer[s] the specific challenged power; instead, the inquiry focuse[s] on whether, given the Constitution's text, the challenged power [is] 'authorized' "—that is, whether it "is an appropriate power under [article XI], section 4(e)." (*Id.* at p. 1214.) While the court agreed with the plaintiff that the Constitutional authorization for charter counties to provide for the powers and duties of county officers did not authorize " '*any* power the county electorate may choose to provide,' " it concluded that San Diego County could create a CLERB with the power to issue subpoenas because "the grant of power to issue subpoenas is the type of 'power' properly conferrable under article XI, section 4(e)." (*Dibb*, *supra*, at pp. 1216, 1218–1219.)[8]

In so holding, the court noted that the case before it did not present a conflict between article XI, sections 4(d) and (e)—that is, the grant of subpoena powers pursuant to section 4(e), which authorizes charters to provide for "the powers and duties of . . .

---

[8] In this regard, the court noted that many local governments nationwide gave subpoena power to boards like the CLERB, and "the power to issue subpoenas is reasonably necessary to the full accomplishment of the legitimate goals of the legislation." (*Dibb*, *supra*, 8 Cal.4th at pp. 1216–1217.) Thus, the court said, "we reject plaintiff's assertion that the power granted by the charter amendment to issue subpoenas is outside the constitutionally authorized scope of section 4(e)." (*Id.* at p. 1217.)

20

county officers," did not run afoul of section 4(d), which requires county charters to provide for "[t]he performance of [any] functions required by statute." (*Dibb*, *supra*, 8 Cal.4th at p. 1217, fn. 10.) The court expressly did not decide "whether and to what extent a county charter provision providing for the 'powers and duties . . . of county officers' under section 4(e) supersedes general state law when such a conflict exists." (*Ibid.*)

We draw several lessons from *Reuter* and *Dibb*. Importantly, state laws defining the powers and duties of county officers and boards of supervisors are not binding on charter counties; instead, counties may, through their charters, provide for powers and duties of county officers "different from and inconsistent with those provided by the general laws." (*Reuter*, *supra*, 220 Cal. at p. 324.) A county's right of self-governance by charter is not without limits, however: (1) the exercise of self-governance must be "properly grounded on the county's authority to provide for the 'powers and duties' of its local officers and the operation of local government" (*Dibb*, *supra*, 8 Cal.4th at p. 1211), and (2) a county may not, through its charter, "incapacitate itself to perform public functions, the exercise of which has been delegated to it by the state" (*Reuter*, at p. 325; *Dibb*, at p. 1217, fn. 10).

With this framework in mind, we turn to the Coalition's challenges to Measure J.

**C. Measure J is properly grounded in the County's powers pursuant to article XI, sections 4(d) and (e) to define the powers and duties of the Board and county officers and to provide for the performance of functions required by statute.**

Los Angeles County is a charter county, and thus it is entitled to " 'home rule in [its] local and county affairs' "—that is, to "create [its] own local government and define its powers within the limits set out by the Constitution." (*Dibb*, *supra*, 8 Cal.4th at p. 1218.) The question for us is whether the amendment to the County charter adopted by Measure J is within these constitutional limits.[9]

The Coalition contends that Measure J is invalid because the state Constitution does not specifically permit county charters to address budgeting. But as we have said, *Dibb* specifically rejected the contention that "charter counties have only such authority as is 'expressly' conferred by the Constitution or by statute." (*Dibb*, *supra*, 8 Cal.4th at p. 1213.) Instead, *Dibb* explained that the appropriate inquiry is "not whether the Constitution *expressly* conferred the specific challenged power," but whether "given the Constitution's text, the challenged power was '*authorized.*' " (*Id.* at p. 1214, italics added.) Under *Dibb*, therefore, the relevant question is not whether the Constitution expressly confers budgeting authority on counties, but instead whether Measure J is an authorized exercise of county power.

As to that issue, as noted above, article XI, section 4(e) provides that county charters "*shall provide for . . . [t]he powers*

_____

[9] The Coalition contends that charter counties have narrower home rule authority than do charter cities. We do not disagree, but the point is irrelevant to our analysis.

*and duties of governing bodies* and all other county officers." (Italics added.) The amendment enacted by Measure J does precisely that: It empowers the Board to allocate locally generated unrestricted revenues in the County's general fund, and it provides a framework within which such funds shall be allocated. In other words, Measure J defines a "power" (allocating locally generated unrestricted revenues) and a "duty" (directing 10 percent of such revenues to particular purposes) of the County's "governing body" (the Board). Because the amendment thus is "grounded [in] the county's authority to provide for the 'powers and duties' of its local officers and the operation of its local government, it is within the competence of [its] charter." (*Dibb, supra,* 8 Cal.4th at p. 1211.)

The amendment enacted by Measure J also is consistent with article XI, section 4(d), which says that county charters shall provide for "[t]he performance of functions required by statute." As the Coalition notes, a critically important function assigned by state statutes to county boards of supervisors is the annual adoption of county budgets. (See, e.g., § 29000 et seq.) The amendment guides the Board in this process, describing how a portion of the County budget shall be allocated. It thus is well within the County's right of self-government.

The Coalition urges that Measure J does not provide for a "power" of the Board within the meaning of article XI, section 4(e) because it "*limits and restricts* the most critical duty of the governing body—the management of the County's fiscal affairs as the [Board] deems necessary." (Italics added.) In other words, the Coalition posits that because Measure J gives the Board something less than full discretion over the County budget, it is outside of the County's competence under article XI, section 4(e).

23

But the Coalition's analysis assumes that a charter amendment may only *expand* the powers of county officers, not restrict or reassign those powers. The Coalition cites no authority for this proposition, and we are not aware of any. Indeed, *Reuter* suggests otherwise, holding that San Mateo County could, through its charter, lawfully transfer jurisdiction over the county's public roads and highways from the supervisors to the county engineer, thus limiting the supervisors' powers and duties. (*Reuter, supra*, 220 Cal. at p. 327.)

Nor is the absence of a reference to the powers of the voters in article XI, section 4 relevant to our analysis. The Coalition suggests that Measure J is unconstitutional because "the Constitution [does not] authorize a county charter to allow *the voters* to have any role in appropriating money from the county general fund or restricting the discretion of the [Board] over county expenditures." (Italics added.) But as we have said, the Constitution provides that a county charter can be amended only "in the same manner" as it was originally adopted—i.e., by majority vote of the county's voters. (Cal. Const., art. XI, § 3, subd. (a).) Thus, if the scope of a board's budgeting discretion is a proper subject of a county charter, county voters must have the state constitutional right to adopt a charter addressing that subject.

### D. Measure J does not incapacitate the County from performing any state-delegated public functions.

The Coalition alternatively contends that Measure J is unconstitutional because it impairs the exercise of essential government functions—namely, the management of the County's budget, particular in the area of public safety. Specifically, citing

*County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 699, the Coalition urges: " 'The budgetary process entails a complex balancing of public needs in many and varied areas with the finite financial resources available for distribution among those demands. It involves interdependent political, social and economic judgments which cannot be left to individual officers acting in isolation; rather it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available.' " The amendment adopted by Measure J thus impairs the exercise of essential government functions, the Coalition urges, because it hobbles the Board's ability "to balance the complex and competing public needs *at that time* with the finite financial resources available *at that time* for distribution among those competing needs."

Our Supreme Court addressed—and rejected—a similar contention in *DeVita*, *supra*, 9 Cal.4th 763. *DeVita* was a challenge to an initiative approved by the voters of Napa County that amended the county's general plan to preserve agricultural land, and further required that most changes to the general plan over the next 30 years be submitted to the voters. (*Id.* at p. 771.) The plaintiffs challenged the amendment on a variety of grounds, including that "the rigidity of [the] general plan initiative amendment frustrates the basic purposes of the planning law" by "tying the hands of subsequent boards to amend the [general] plan as conditions warrant." (*Id.* at p. 789.) The court disagreed, concluding that the lack of flexibility created by the amendment was "not inherently inconsistent with" the planning law. (*Ibid.*) The court explained that while "some degree of flexibility is desirable in the planning process," it is "also desirable that plans

25

possess some degree of stability so that they can be 'comprehensive [and] long-term' guides to local development," and the planning law "leaves it largely to each locality to balance the competing values of flexibility and stability in the planning process." (*Id.* at pp. 789–790.) The court "c[ould] not say" that the initiative passed by the voters was the best policy for the county, "[b]ut we also cannot say that the measure, as it comes to us today, thwarts the basic purposes of the planning law. On the contrary, it appears to be a reasonable attempt to effectuate those purposes by delineating a long-range policy intended to guide the county's development, curb haphazard growth, and promote desired land uses." (*Id.* at p. 792.)

The same analysis applies here. Like the initiative at issue in *DeVita*, Measure J unquestionably restricts the exercise of budgetary discretion by future Boards, but it also increases budgetary stability for certain categories of expenditures that are priorities for County voters. Like the court in *DeVita*, we cannot say that a constraint of this kind is desirable, but we also cannot conclude that it seriously impairs the Board's exercise of its essential budgeting functions. Moreover, as the County notes, if Measure J proves to be unduly constraining, the County is not without recourse: The Board may, by a four-fifths vote, reduce the Measure J set-aside in the event of a fiscal emergency, or the voters may again amend the County charter. (See *DeVita*, *supra*, 9 Cal.4th at p. 793 ["We see no reason to suppose that, if [the initiative] at some point causes the Napa County General Plan to become inadequate—a scenario that is by no means inevitable— the electorate will not approve a proper corrective amendment proposed by the board"]; see also *Denham, LLC v. City of Richmond* (2019) 41 Cal.App.5th 340, 356 [court will not presume

that, should general plan become obsolete, "the City or, if necessary, the voters will fail to take appropriate action to correct the inconsistency"].)

Nor can we conclude, as the Coalition would have us do, that shifting funds from law enforcement to the other purposes prescribed by Measure J will impair public safety. This proposition is not self-evident, and the voters who passed Measure J appear to have believed otherwise. Indeed, the arguments in favor of Measure J urged that the measure would "address the root causes of crime" through restorative justice programs, counseling and mental health services, job training, and supportive housing, thus *reducing* crime. (L.A. County Official Sample Ballot, Gen. Elec. (Nov. 3, 2020) argument in favor of Measure J, p. 35.)[10]

For all of these reasons, we conclude that Measure J does not impair the exercise of any essential government function.

## III. Measure J does not conflict with state statutory law.

The Coalition's central contention on appeal is that Measure J is unconstitutional because it conflicts with state laws that delegate county budgeting decisions to the Board, not the voters, on a matter of statewide importance. The Coalition's underlying premise is in error: As we have said, *Reuter* and *Dibb* hold that counties may, through their charters, provide for duties of county officers "different from and inconsistent with those

---

[10] On the court's own motion, we take judicial notice of the 2020 Los Angeles County ballot materials. (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see also *Broad Beach Geologic Hazard Abatement Dist. v. 31506 Victoria Point LLC* (2022) 81 Cal.App.5th 1068, 1084, fn. 11 [judicially noticing ballot materials].)

27

provided by the general laws" (*Reuter*, *supra*, 220 Cal. at p. 324) so long as such duties are properly grounded in the county's constitutional authority and do not incapacitate the county from performing its public functions. Thus, even were we to conclude that Measure J conflicts with state law, we would still find the initiative valid for the reasons discussed in the prior section. But in any event, we find no conflict between Measure J and state statutes.

### A. Statutes governing county budgets.

The Coalition has identified three groups of statutes it contends govern the county budgeting process and reveal an intent to delegate budgeting decisions to the Board exclusively, not to the voters. They are as follows:

### 1. The County Budget Act.

The County Budget Act governs the adoption of county budgets. It provides that the state controller "shall promulgate such rules, regulations, and classifications as are deemed necessary and commensurate with the accounting procedures for counties . . . to secure standards of uniformity among the various counties and to carry out the provisions of this chapter." (§ 29005, subd. (a).) The controller shall prescribe "the forms required to be used in presenting the required information in the budget document," but "[a]ny county may add to the information required, or display it in more detail, provided that the financial information and the classifications or items required to be included in the budget are clearly and completely set forth." (*Id.*, subd. (b).)

Articles 2 through 4 of the County Budget Act set out the procedures by which a board of supervisors shall adopt a budget.

These articles provide that on or before June 10 of each year, each official in charge of a budget unit shall submit a budget request (§ 29040), and the auditor shall provide estimates for bonded debt service requirements (§ 29043) and estimated financing sources (§ 29044). The administrative officer or auditor shall compile the budget requests (§ 29060) and prepare a recommended budget (§ 29061), which shall be submitted to the board by June 30 (§ 29062). Thereafter, the board shall conduct a public hearing (§§ 29080–29082), at the conclusion of which, and after making any revisions of, deductions from, or increases or additions to, the recommended budget it deems appropriate, the board shall adopt a final budget (§ 29088).

### 2. Sections 30603–30608.

Sections 30603 through 30608 provide that the County of Los Angeles "shall annually submit its proposed budget to the Governor, the Legislature, and the State Auditor, including estimated actual expenditures and revenues for the current year" (§ 30603), and "shall, for each program in the budget, provide actual expenditure data to enable comparison of actual expenditures with the current estimated and proposed levels" (§§ 30603, 30604). Thereafter, the state Legislative Analyst "shall conduct a review" and "mak[e] recommendations" concerning "[c]ounty operations that will minimize future county fiscal emergencies and promote long-term fiscal viability." (§ 30608.)

### 3. Section 26227.

Section 26227 provides, in relevant part: "The board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs

or to fund other programs deemed by the board of supervisors to be necessary to meet the social needs of the population of the county, including but not limited to, the areas of health, law enforcement, public safety, rehabilitation, welfare, education, and legal services, and the needs of physically, mentally and financially handicapped persons and aged persons."

## B. Partial preemption by state delegation to a local "legislative body."

The County contends that because the statutes described above give budget responsibilities to "the board of supervisors," they preclude the voters from adopting binding budget priorities that limit the exercise of the Board's discretion. For the reasons that follow, we disagree.

Our Supreme Court addressed a similar contention in *DeVita*, *supra*, 9 Cal.4th 763. As noted above, *DeVita* was a challenge to a voter-adopted amendment to a county's general plan that permitted future changes to the general plan only with voter approval. Several county residents challenged the measure, asserting that general plans could not be amended by initiative, and the authority of future boards of supervisors to amend the general plan could not be limited by mandatory voter approval requirements. (*Id.* at pp. 771–772.) In support, the plaintiffs noted that the state planning law, sections 65100 to 65763 (planning law), delegated the amendment of a general plan to the "legislative body": It provided that the "legislative body" must refer any proposed amendment to various public entities; the planning commission must make a written recommendation on any proposed amendment to the "legislative body"; the "legislative body" must hold at least one public hearing and by resolution either approve, modify, or disapprove the

recommendation; and the "legislative body" may amend all or part of the general plan " '[i]f it deems it to be in the public interest.' " (*Id.* at pp. 773–774 & fn. 4.) The plaintiffs contended that because these provisions required general plan amendments to be approved by "the legislative body," they revealed a legislative intent to bar voter amendments to the general plan. (*Id.* at p. 785.)

The Supreme Court rejected the plaintiffs' challenge, concluding that the planning law did not reveal a legislative intent to exclude the electorate from amending the general plan. (*DeVita*, *supra*, 9 Cal.4th at pp. 779–780.) The court explained that absent a clear showing of the Legislature's intent to the contrary, legislative decisions of a board of supervisors are presumed to be subject to the voters' exercise of initiative and referendum.[11] (*Id.* at p. 775.) That presumption is rebuttable, however, "upon a definite indication that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right."

---

[11] "The initiative power allows voters to propose new measures and place them on the ballot for a popular vote. If the measure is approved by popular vote, it becomes law. (Cal. Const., art. II, §§ 8; 10, subd. (a).) The referendum power, by contrast, allows voters to weigh in on laws that have already been passed by their elected representatives. Any voter or group of voters that gathers enough signatures can place a legislative enactment on the ballot for an up or down vote. A referendum suspends operation of the law until it is approved by a majority of voters. (Cal. Const., art. II, §§ 9, subd. (a),10, subd. (a); see *City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1078 [(*City of Morgan Hill*)].)" (*Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105, 1111.)

31

(*DeVita, supra,* 9 Cal.4th at p. 776.)  A "definite indication" may be found either where a local legislative body's discretion has been fully preempted by statutory mandate or where the Legislature "did not intend to restrict local legislative authority but rather to delegate the exercise of that authority *exclusively* to the governing body."  (*Ibid.*, italics added.)

The court noted that in *Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 504 (*COST*), it had set out certain guidelines for determining when a legislative intent to exclusively delegate authority to the local governing bodies is present.  The paramount factors recognized by *COST* were: (1) "statutory language, with reference to 'legislative body' or 'governing body' deserving of a weak inference that the Legislature intended to restrict the initiative and referendum power, and reference to 'city council' and/or 'board of supervisors' deserving of a stronger one"; (2) "the question whether the subject at issue was a matter of 'statewide concern' or a 'municipal affair,' with the former indicating a greater probability of intent to bar initiative and referendum"; and (3) "[a]ny other indications of legislative intent."  (*DeVita, supra*, 9 Cal.4th at p. 776.)  The *DeVita* court noted, however, that while *COST* "brought to light certain interpretive principles implicit in case law," it did not "prescribe a set of fixed rules for mechanically construing legislative intent" or "alter the constitutionally based presumption that the local electorate could legislate by initiative on any subject on which the local governing body could also legislate."  (*Id.* at p. 777.)  Thus, the court explained, "it is still the case that ' " '[i]f doubts can [be] reasonably resolved in favor of the use of [the] reserve initiative power, courts will preserve it.' " ' "  (*Ibid.*)

32

In the case before it, the court said that although the planning law delegated authority to amend the general plan to the "legislative body," this language "is by itself inconclusive on the question of exclusive delegation." (*DeVita, supra,* 9 Cal.4th at p. 780.) It explained: "[The planning law does], it is true, refer to the 'legislative body' adopting and amending general plans. But as we observed in *COST*: '[m]any powers conferred by statute on the "legislative body" of a local entity have been held to be subject to initiative and referendum.' [Citations.] *COST* does not hold that the use of the generic terms 'legislative body' or 'governing body' in a statute is alone sufficient to dispel the presumption in favor of the local right of initiative and referendum." (*Ibid.*)

The court explained that the next step in discerning the Legislature's intent was to look to "whether and to what extent the statute or statutory scheme in question pertains to matters of statewide concern." (*DeVita, supra,* 9 Cal.4th at p. 780.) The court noted that an intent to exclude voter action is more readily inferred if a statute addresses a matter of statewide concern rather than a purely municipal affair because "[o]nly in matters that transcend local concerns can the Legislature have intended to convert the city and county governing bodies into its exclusive agents for the achievement of a 'legislative purpose of statewide import.'" (*Ibid.*) The court cautioned, however, that courts should not "automatically infer that a statutory scheme restricts the power of initiative or referendum merely because some elements of statewide concern are present." (*Id.* at pp. 780–781.) To the contrary, "it is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decisionmaking implies a legislative intent to bar the right of initiative." (*Id.* at p. 781.)

33

Instead, courts "must inquire concretely into the nature of the state's regulatory interests to determine if they are fundamentally incompatible with the exercise of the right of initiative or referendum, or otherwise reveal a legislative intent to exclusively delegate authority to the local governing body." (*Id.* at p. 781.)

As relevant to the case before it, *DeVita* noted that while the planning law placed some minimal regulation on local planning, it left most land use decisions in the hands of cities and counties. (*DeVita*, *supra*, 9 Cal.4th at p. 782.) It explained: "The minimal regulation set forth in the planning law requires cities and counties to adopt a general plan with certain mandatory elements that will generally govern 'the future development, configuration and character of the city or county and require that future land use decisions be made in harmony with that general plan. [¶] . . . [¶] . . . [¶] Except for mandating the development of a plan, specifying the elements to be included in the plan, and imposing on the cities and counties the general requirement that land use decisions be guided by that plan, the Legislature has not preempted the decision making power of local legislative bodies as to the specific contours of the general plan or actions taken thereunder.' " (*Id.* at pp. 782–783.) Instead, section 65700, subdivision (a), by making clear that the planning law only applies certain minimal requirements to the general plans of charter cities, leaves " 'wide discretion to a local government . . . to determine *the contents* of its land use plans.' " (*DeVita*, at pp. 784, 783, italics added.) Under these circumstances, the court found no implied limitation in the planning law prohibiting the voters from amending a general plan. (*Id.* at p. 783.)

34

The *DeVita* court then considered and rejected a number of the plaintiffs' contentions. Noting that general plan amendments may have effects outside the county's borders in such areas as housing and traffic circulation, the plaintiffs urged that the Legislature must have intended to preclude voters from amending a general plan. (*DeVita*, *supra*, 9 Cal.4th at p. 784.) This contention, the court said, "misreads prior case law. The probability that general plan amendments will have regional or statewide impacts certainly supports the contention that the Legislature possesses the *constitutional authority* to limit the power of initiative in this area if it chose to do so. [Citation.] But whether the Legislature *actually intended* to limit the power of initiative is another matter. Our examination of the planning law, with its deference to local autonomy, leads us to the conclusion that the Legislature had no such intention, and that therefore the land use element of a general plan can be amended by initiative." (*Ibid*., second italics added.)

The plaintiffs next contended that an intent to bar amendments to the general plan by initiative should be inferred from the numerous procedural requirements for adopting and amending general plans. (*DeVita*, *supra*, 9 Cal.4th at p. 785.) The court disagreed, pointing to prior cases that "exemplify the rule that statutory procedural requirements imposed on the local legislative body generally neither apply to the electorate nor are taken as evidence that the initiative or referendum is barred." (*Id*. at p. 786.) This rule, the court said, "is a corollary to the basic presumption in favor of the electorate's power of initiative and referendum. When the Legislature enacts a statute pertaining to local government, it does so against the background of the electorate's right of local initiative, and the procedures it

35

prescribes for the local governing body are presumed to parallel, rather than prohibit, the initiative process, absent clear indications to the contrary." (*Ibid.*)

The court considered, finally, the plaintiffs' assertion that the initiative would permit the general plan to become obsolete. The court disagreed: "It is of course conceivable that the Napa County General Plan will, as the result of [the initiative], fall so far behind changing local conditions that the County will fail to fulfill an implied statutory duty to keep its general plan current. [Citation.] . . . We should not presume—nor, given the rule that doubts should be resolved in favor of the initiative and referendum power, should we assume the Legislature presumed—that the electorate will fail to do the legally proper thing. We see no reason to suppose that, if [the initiative] at some point causes the Napa County General Plan to become inadequate—a scenario that is by no means inevitable—the electorate will not approve a proper corrective amendment proposed by the board. If, down the road, the electorate fails to act appropriately, courts may then be asked to intervene to remedy deficiencies in the general plan, as they would likely act if the board itself failed to properly revise the general plan. But we cannot infer from the mere possibility that such deficiencies may occur an intent to categorically ban general plan amendment initiatives." (*DeVita*, *supra*, 9 Cal.4th at pp. 792–793.)

C.    **The statutes cited by the Coalition do not preclude the voters from adopting a budgetary framework that binds that Board.**

The Coalition urges that because the statutes described above assign duties to "the board of supervisors," there is " 'strong' evidence of the Legislature's intent to *exclusively*

delegate all budgeting decisions to the [Board] and those County officials specifically directed to undertake budgeting activities." Not so. It is true, as the Coalition notes, that our Supreme Court said in *COST* that "the Legislature's use of the terms 'board of supervisors' and 'city council' . . . gives rise to a strong inference that the Legislature intended to preclude exercise of the statutory authority by the electorate." (*COST*, *supra*, 45 Cal.3d at p. 505.) The court subsequently clarified in *DeVita*, however, that while *COST* "brought to light certain interpretive principles implicit in case law," it did not "prescribe a set of fixed rules for mechanically construing legislative intent" or "alter the constitutionally based presumption that the local electorate could legislate by initiative on any subject on which the local governing body could also legislate." (*DeVita*, *supra*, 9 Cal.4th at p. 777.) And, even more recently, in *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 945–946, the Supreme Court said that absent "an *unambiguous indication* that a provision's purpose was to constrain the initiative power," a reviewing court should "not construe it to impose such limitations." (Italics added; see also *City of Morgan Hill*, *supra*, 5 Cal.5th at pp. 1078–1079 ["We only find local application of the public's power of referendum or initiative preempted if there is a 'definite indication' or a ' "clear showing" ' that it was within the ambit of the Legislature's purpose to restrict those rights"].)

We do not find such an "unambiguous indication" in the Legislature's references to "board of supervisors" in the County Budget Act and related statutes. As intervenors correctly note, unlike many state laws that apply equally to city and county governments, the County Budget Act applies only to counties, specifying the procedures that county boards of supervisors must

37

follow in adopting a budget. (See, e.g., § 29002 [County Budget Act "shall apply to counties, dependent special districts, and other agencies whose affairs and finances are under the supervision and control of the board"].) In light of the County Budget Act's scope and purpose, it is unsurprising that the Legislature uses the term "board" since there is no other local legislative or governing body that could enact a county budget. In contrast, the planning law at issue in *DeVita* used the more generic term "legislative body" because it applied to both cities and counties. (*DeVita*, *supra*, 9 Cal.4th at p. 773 [planning law compels creation of general plan by "cities and counties"].) We therefore do not perceive the references to the "board of supervisors" in the County Budget Act to be a useful indicator of the Legislature's intent with regard to exclusive delegation. (See *Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233, 245 (*Pettye*) [Welf. & Inst. Code, § 17001, which directed that standards of aid for general assistance recipients should be adopted by "[t]he board of supervisors of each county, or the agency authorized by county charter," was "inconclusive" as to whether the Legislature intended to preclude changes to county general assistance standards by voters].)

Further, even were we to conclude that the statutory reference to "board of supervisors" implied an exclusive delegation, we still would find no conflict between the County Budget Act and Measure J because the measure does not allow the electorate to exercise any of the powers or duties the County Budget Act grants to the Board. As we have described, the County Budget Act requires the Board to consider the recommended budget submitted by the CEO or auditor, make a proposed budget publicly available, hold public hearings, and

38

adopt a final budget.  (§§ 29063, 29064, 29082, 29088.)  Nothing in Measure J precludes the Board from undertaking any of these duties.  To the contrary, Measure J specifically provides that it "shall be the duty *of the Board of Supervisors*" to allocate the County's "locally generated unrestricted revenues in the general fund . . . as determined annually in the budget process" after considering input from the public and county departments at public hearings.  (Italics added.)  In short, Measure J neither purports to delegate to the voters the task of adopting a budget nor seeks to prevent the Board from doing so.

Similarly, Measure J does not preclude the county auditor or CEO from undertaking any of their statutory duties, including "compil[ing] the budget requests" (§ 29060), "review[ing] the budget requests and prepar[ing] a recommended budget," noting any differences "in the written recommendations or comments, or both" (§ 29061), and "submitt[ing]" the recommended budget to the board of supervisors (§ 29062).  Indeed, Measure J does not reference the auditor or CEO in any fashion, nor does it purport to reassign to others the tasks delegated by the County Budget Act to the auditor and CEO.

Measure J's only arguable statutory conflicts are with section 29088, which provides that "after making any revisions of, deductions from, or increases or additions to, the recommended budget *it deems advisable* during or after the public hearing, the board shall by resolution adopt the budget as finally determined," and section 26227, which says that "[t]he board of supervisors of any county may appropriate and expend money from the general fund of the county to establish county programs or to fund other programs *deemed by the board of supervisors to be necessary* to meet the social needs of the

39

population of the county." (Italics added.) The Coalition urges that Measure J is inconsistent with these sections because it precludes the Board from making budgetary changes it "deems advisable" or "deem[s] . . . necessary" if that decision conflicts with Measure J.

There can be no doubt that the charter amendment adopted by Measure J constrains to some degree the Board's discretion in allocating County funds. But that was equally true in *DeVita*, where one of the statutory provisions at issue stated that the "legislative body" may amend all or part of the general plan if "*it*"—presumably, the legislative body—" 'deems it to be in the public interest.' " (*DeVita*, *supra*, 9 Cal.4th at p. 773, fn. 4.) Notwithstanding this provision, the court concluded that the statute was "inconclusive on the question of exclusive delegation." (*Id.* at p. 780.)

Measure J does not limit the Board's discretion to any greater extent than did the initiative considered in *DeVita*. Indeed, Measure J has far *less* impact on Board discretion than did that initiative. The *DeVita* initiative provided that the county's general plan could be amended *only* by the voters, notwithstanding a state statute giving authority to amend county general plans to "the legislative body." (*DeVita*, *supra*, 9 Cal.4th at pp. 773, 771.) In other words, the initiative considered in *DeVita* entirely deprived the board of supervisors of the power granted it by statute to amend the general plan. Measure J constrains Board discretion to a far less significant degree: While Measure J requires the Board to direct a portion of County revenues to particular categories of programs—for example, to job training, rental assistance, transitional and supportive housing, youth programs, and health, mental health,

40

and substance abuse programs—it leaves all of the ultimate spending decisions to the Board.  Within the broad parameters imposed by Measure J, therefore, the Board continues to have sole discretion to decide which County programs will receive funding and in what amounts.

For all of these reasons, we conclude that the statutes on which the Coalition relies do not reveal a legislative intent to exclusively delegate the setting of county budgetary priorities to the Board.

### D.    The state's interests are not incompatible with permitting voters to set County budget priorities for locally generated unrestricted revenue.

Although it is unnecessary to our decision, we briefly consider whether the state's interests are incompatible with Measure J.  (*DeVita*, *supra*, 9 Cal.4th at p. 781.)  The Coalition makes two contentions in this regard:  (1) the state has an interest in county budgeting generally; and (2) the state has an interest in county public safety expenditures specifically.  As we discuss, these contentions lack merit.

### 1.    State interest in county budgeting generally.

The Coalition urges that Measure J implicates state interests because the state has an interest in county budgeting generally.  We agree in part:  Particularly in view of its large size, Los Angeles County's budgetary decisions undoubtedly have some regional and statewide impacts.  (*DeVita*, *supra*, 9 Cal.4th at p. 784.)  But as *DeVita* explained, while impacts outside county borders may support a conclusion that the Legislature possesses

41

the *constitutional* authority to limit the power of initiative in this area if it chooses to do so, "whether the Legislature *actually intended* to limit the power of initiative is another matter." (*Ibid.*, italics added.)  In other words, voters cannot be deprived of the exercise of direct democracy on local matters merely because the state has a *theoretical* interest in the subject of the initiative—rather, the state must have *demonstrated* that interest legislatively.

*DeVita* cautioned, moreover, that "it is erroneous to assume that a statute or statutory scheme that both asserts certain state interests and defers in other respects to local decisionmaking implies a legislative intent to bar the right of initiative." (*DeVita*, *supra*, 9 Cal.4th at p. 781.)  There, as we have said, the court considered a statute that "specif[ied] the elements to be included in the plan, and impos[ed] on the cities and counties the general requirement that land use decisions be guided by that plan," but "le[ft] wide discretion to a local government . . . to determine the contents of its land use plans." (*Id.* at p. 783.)  Under those circumstances, the *DeVita* court said, the freedom given counties to make substantive planning decisions "belies the claim that the Legislature intended to delegate the general plan amendment authority exclusively to local governing bodies in order to fulfill the statewide objectives of the planning law." (*Id.* at p. 784.)

The court similarly concluded in *Pettye*, *supra*, 118 Cal.App.4th at pp. 246–247.  The statute at issue in that case required counties to provide general assistance benefits to indigent populations, but conferred broad discretion on counties to set local general assistance standards.  That discretion was inconsistent with a legislative intent to preclude the exercise of initiative and referendum, the court concluded.  It explained that

42

although the provision of general relief (the "overarching 'macro' policy") was unquestionably a matter of statewide concern, the Legislature had "also conferred broad discretion upon local governments to promulgate local, 'micro' policies in furtherance of this statewide mandate," such that within the overall state guidelines, counties "retain[ed] extensive authority to set [general relief] standards on matters ranging from eligibility to type and amount of relief and conditions attached thereto."  (*Id.* at p. 245.)  In view of the "ample leeway for local variation in [general assistance] programs, leaving substantial autonomy in the hands of counties to craft [general assistance] programs to meet community needs," the court concluded that "it matters not to the Legislature whether [general assistance] standards are adopted by the board of supervisors or the voters."  (*Id.* at pp. 246–247; see also *Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714, 716–717, 722 [provision of the Integrated Waste Management Act giving "the governing body of the local governmental agency" the authority to grant an exclusive franchise for solid waste handling services did not abrogate citizens' right to vote on whether to repeal a long-term extension of the franchise granted by their municipal council because the statewide regulatory scheme "makes ample allowance for local variation"].)

Like the statutes considered in *DeVita* and *Pettye*, the County Budget Act sets some general parameters for county budgeting, but leaves the substance of budget allocations entirely to individual counties.  For example, section 29005 requires the state controller to promulgate accounting rules "to secure standards of uniformity among the various counties"; sections 29006 to 29009 set out the manner in which counties shall report

43

budget data; and sections 29040 to 29093 set out the procedural requirements governing the submission and review of departmental budget, conduct of public hearings, and adoption of final budgets. The Act's parameters thus are directed almost exclusively towards standardizing the dates by which county budgets are adopted and the manner in which they are reported—not the purposes to which the budgets are put. In fact, these provisions do not provide any substantive guidance about the kinds of programs that counties must fund or the levels at which they must do so. To paraphrase *DeVita*, therefore, we conclude that the freedom given counties to make substantive budgetary decisions belies the claim that the Legislature intended "to delegate [the setting of budget priorities] exclusively to local governing bodies in order to fulfill the statewide objectives of the [County Budget Act]." (*DeVita*, *supra*, 9 Cal.4th at p. 784.)

### 2. State interest in county public safety expenditures.

The Coalition also contends that Measure J is a matter of statewide importance because the state has a strong interest in County public safety expenditures. In support, the Coalition notes that (1) pursuant to section 30056, the Public Safety Augmentation Fund is "a matter of statewide concern," (2) article XIII, section 35, subdivision (a)(1) of the California Constitution provides that "[p]ublic safety services are critically important to the security and well-being of the State's citizens and to the growth and revitalization of the State's economic base," (3) article XIII, section 35, subdivision (a)(2) states that "[t]he protection of the public safety is the first responsibility of local government and local officials have an obligation to give

44

priority to the provision of adequate public safety services," and (4) article I, section 28, subdivision (a) states that "[t]he rights of victims of crime and their families in criminal prosecutions are a subject of grave statewide concern."

We do not dispute that the state has an interest in public safely generally, but that is not enough to support a conclusion that the Legislature intended to bar the right of local initiative in this area.  (See *Reuter*, *supra*, 220 Cal. at p. 325 [state's "general interest" in roads and highways insufficient for state to dictate duties of particular individuals relating to highway safety and repair].)  Instead, the Coalition must demonstrate that Measure J interferes with the state's regulatory interests as expressed by statute.  It manifestly has not done so.

Items 1 through 3 above all relate to Proposition 172, which California voters approved in 1993.  Proposition 172 (codified as article 13, section 35 of the California Constitution) imposed a statewide sales and use tax "to assist local government in maintaining a sufficient level of public safety services," which was declared to be "critically important to the security and well-being of the State's citizens and to the growth and revitalization of the State's economic base."  (Cal. Const., art. XIII, § 35, subds. (a)(3), (a)(1).)  The Legislature then enacted sections 30051 to 30055, which distributed the Proposition 172 sales tax revenues to counties and cities.  (§§ 30054, 30055; see also *City of Scotts Valley v. County of Santa Cruz* (2011) 201 Cal.App.4th 1, 17, fn. 12 [discussing Proposition 172].)  Section 30055 requires each county to create "a Public Safety Augmentation Fund in the county treasury to receive those revenues allocated to the county pursuant to Sections 30052 and 30053," and further requires that amounts deposited in the Public Safety Augmentation Fund

45

"shall be expended exclusively to fund public safety services." Pursuant to section 30056, "the allocation of the Public Safety Augmentation Fund is a matter of statewide concern and is not merely a municipal affair or a matter of local interest."

The legislative declarations about the state's interest in public safety services on which the Coalition relies, therefore, are not abstract declarations of principle, but relate concretely to the state's collection and distribution of sales tax revenues pursuant to Proposition 172. The revenues subject to Measure J are *not* Proposition 172 funds; as we have said, Measure J facially concerns only funds that are both "locally generated" (i.e., not transferred by the state) and "unrestricted" (i.e., not subject to Proposition 172 restrictions). These legislative statements, therefore, are irrelevant to the County revenues that are subject to Measure J.

Item 4 above derives from Proposition 9, which the voters approved in 2008. Titled the "Victims' Bill of Rights Act of 2008," Proposition 9 made significant changes to the parole process and created many new substantive rights for crime victims and their families, including the rights to notice of, and to be heard at, all proceedings involving the defendant, and to be informed of a defendant's scheduled release date. (Cal. Const., art. I, § 28, subd. (b); Pen. Code, §§ 3041.5–3044.) The Coalition has not suggested that the rights enumerated in Proposition 9 will be in any way imperiled by Measure J, or indeed that any Measure J funds support Proposition 9 programs. The legislative statements adopted as part of Proposition 9, therefore, appear irrelevant to County revenues subject to Measure J.

In short, while the state unquestionably has an interest in public safety generally, it has not acted on that interest

46

legislatively by mandating expenditures of county locally generated unrestricted revenues. Instead, it has left the disposition of those funds to the counties themselves. We therefore cannot conclude that Measure J imperils any state regulatory interest related to public safety.

### E.     The cases the Coalition relies on do not compel a different result.

The Coalition's appellate brief relies heavily on *Totten*, *supra*, 139 Cal.App.4th 826, which concerned the validity of an initiative adopted by the voters of Ventura County that the Coalition says "is the inverse of the Charter amendment here." The Ventura County initiative created a trust fund to receive Proposition 172 revenues, specified the amounts to be allocated to five public safety agencies (the district attorney, sheriff, corrections department, public defender and fire protection district) for the 1995–1996 fiscal year, and provided that subsequent year budgets for those agencies must be, at a minimum, 100 percent of the 1995–1996 budget "plus any associated inflationary costs." (*Id.* at p. 832.) For several years, Ventura County's board of supervisors interpreted "associated inflationary costs" to mean the actual increase in the costs of delivering services, but in 2001, the board decided to key inflationary costs to the consumer price index. (*Ibid.*) Ventura County public safety officials sought a writ of mandate compelling the board to abide by its pre-2001 interpretation of "any associated inflationary costs," and the board moved for summary adjudication on the issue of whether the provisions requiring minimum budgets for public safety agencies were invalid because they impaired the board's authority over the county budget. (*Id.* at p. 833.)

47

The appellate court concluded that the budget provisions were prohibited by state law and struck them.  It noted that the County Budget Act delegates budgetary authority to the "board," which the court said gives "rise to a strong inference that the Legislature intended to preclude the electorate from exercising authority over the adoption of a county budget." (*Totten, supra*, 139 Cal.App.4th at p. 835.)  The court further found that county budgets for public safety agencies "are of particular statewide concern" because they involve the use of state funds provided pursuant to Proposition 172, the allocation of which the Legislature had expressly declared to be " 'a matter of statewide concern and . . . not merely a municipal affair or a matter of local interest.' " (*Totten*, at p. 836.)  And, since county budgets for public safety agencies constitute a major portion of county spending, they "are of statewide concern because they may affect a county's ability to adequately fund state-mandated programs unrelated to public safety." (*Ibid*.)

*Totten* is distinguishable in important ways from the present case.  Significantly, Los Angeles is a charter county, and thus it has far more discretion over the management of its internal affairs than does Ventura County, a "general law" county.  (See section II, *ante*.)  Further, the initiative at issue in *Totten* specified budgets for five county agencies in perpetuity, thus depriving the Ventura County board of supervisors of *any* discretion over what was 58 percent of the county's total revenues in 2001, and was expected to grow rapidly over time. (*Totten, supra*, 139 Cal.App.4th at p. 832.)[12]  In other words, the initiative

---

[12]    The Coalition repeatedly suggests that just $4.2 million was at issue in *Totten*.  In fact, $4.2 million was the estimated

considered in *Totten* effectively allowed the voters to directly allocate a majority of Ventura County's budget. In contrast, while Measure J directs a percentage of Los Angeles County's budgets to broad categories of programs, it does not require the Board to fund any particular programs, nor does it direct the levels at which new or existing programs must be funded. In other words, while it constrains the Board's discretion to some degree, it does not give the voters ultimate decision-making authority over how County revenues will be allocated as did the initiative at issue in *Totten*.

Finally, unlike the initiative at issue in *Totten*, Measure J concerns only "*unrestricted* revenues in the general fund" (italics added)—that is, revenues not subject to state mandate or needed to implement state-mandated programs. And, Measure J includes an opt-out provision, permitting the Board, by a four-fifths vote, to reduce the set-aside if a fiscal emergency threatens the county's ability to fund mandated programs.

*Citizens for Jobs and the Economy v. County of Orange* (2002) 94 Cal.App.4th 1311 (*Citizens*) is also distinguishable from the present case. *Citizens* concerned Measure A, passed in 1994, and Measure F, passed in 2000. Measure A authorized the amendment of Orange County's general plan to allow the development of a commercial airport on the former Marine Corps Air Station at El Toro (MCAS El Toro), while Measure F provided that any approval by the county of a civilian airport project, and any expenditure by the county in connection therewith, had to be

___

reduction in the public safety budget for the 2001–2002 fiscal year if the consumer price index was used to calculate inflationary costs—*not* the total amount restricted by the ordinance. (*Totten, supra*, 139 Cal.App.4th at p. 832.)

49

ratified by two-thirds of county voters at a county general election following extensive public hearings.  (*Id.* at pp. 1317–1321.)  The trial court granted a writ of mandate precluding the county from implementing Measure F, finding that the measure interfered with essential government functions by placing "numerous constraints and roadblocks" on the process of developing a civilian airport as had been directed by the passage of Measure A, and further violated provisions of the Government Code that delegated to the board the authority to carry out planning actions relating to reuse of MCAS El Toro.  (*Id.* at pp. 1329–1330, 1333.)  The Court of Appeal affirmed, finding that Measure F "fails the test for an initiative that may properly circumscribe the power of future governing bodies, by requiring voter approval for certain future proposals, if such an initiative simply amounts to a legislative measure that the governing body could itself have enacted."  (*Citizens*, at p. 1334.)  This was so, the court said, because "[t]he voter approval and spending restrictions contained in Measure F do not set new substantive land use policies, but instead make it difficult or impossible for the Board to carry out already established policy that the airport project should be fully investigated at least for planning purposes."  (*Ibid.*)

Measure J is distinguishable from the initiative at issue in *Citizens*.  Significantly, Measure J does not interfere with essential government functions by placing "constraints and roadblocks" on duties mandated by state and federal law, nor does it "make it difficult or impossible for the Board to carry out already established policy."  (*Citizens*, *supra*, 94 Cal.App.4th at pp. 1329, 1334.)  Instead, Measure J "set[s] *new substantive . . . policies*" in the area of County spending, thus "properly

50

circumscrib[ing] the power of future governing bodies." (*Citizens,* at p. 1334, italics added.)

Finally, the present case is distinguishable from *Golightly v. Molina* (2014) 229 Cal.App.4th 1501. The issue presented in *Golightly* was whether the procedure by which the County enters into social program agreements (SPAs) with social services organizations that provide services to county residents is subject to the Brown Act, which imposes open meeting requirements on legislative bodies. (*Id.* at p. 1505.) The court held that the Brown Act did not apply to the SPA approval process because the four individuals who reviewed and signed SPAs (the Board's executive officer, county counsel, county auditor, and county CEO) "do not constitute a legislative body and do not deliberate collectively in approving an SPA." (*Ibid.*) Plainly, *Golightly* does not govern our decision here.

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter a new judgment denying the petition for writ of mandate.  Appellants shall recover their appellate costs.

EDMON, P. J.

We concur:

ADAMS, J.

HEIDEL, J.

52

Filed 7/31/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COALITION OF COUNTY UNIONS, et al., | B314973 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 20STCP04019) |
| v. | ORDER MODIFYING AND CERTIFYING OPINION FOR PUBLICATION |
| LOS ANGELES COUNTY BOARD OF SUPERVISORS, et al., | |
| Defendants and Appellants; | NO CHANGE IN APPELLATE JUDGMENT |
| RE-IMAGINE LOS ANGELES COUNTY COALITION, et al., | |
| Intervenors and Appellants. | |

THE COURT:

     1.    The opinion was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

     2.    On page 52, of the opinion, on the disposition page, insert an asterisk after HEIDEL, J. and add a footnote that reads: "*Judge of the Los Angeles Superior Court, assigned by the

Chief Justice pursuant to article VI, section 6 of the California Constitution."

_____

EDMON, P. J.          ADAMS, J.          HEIDEL, J.*

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2